Box v. Lanier.

M. O. Box, Administrator, *v.* T. L. Lanier, Administrator.

'(*Nashville.*  December Term, 1903.)'

1.  INSURANCE. Life policy payable upon contingency to assured's executors, administrators, or assigns, is assignable to extent of interest. ·

Where a policy of life insurance is payable to the assured's wife should she survive him, otherwise to his executors, administrators, or assigns, he has the absolute control over the policy to the extent of his contingent interest in the policy which he may assign. (*Post, pp.* 400-402.)

Cases cited and approved: ·Williams v. Corson, 2 Tenn. Chy., 269; Rawson ·v. Jones, 52 Ga., 458; Swift v. Association, 96 Ill., 309; Pilcher v. Insurance Co., 33 La. Ann., 322; Insurance Co. v. Flack, 3 Md., 341; Winchester v. Stebbins, 16 Gray (Mass.),·52; Wason v. Colburn, 99 Mass., 342; Insurance Co. v. Ryan, 8 Mo. App., 535; Edington v. Insurance Co., 13 Hun, 543.

2.  SAME. Same. Parol assignment, of·policy to wife divesting husband of contingent interest; so upon her death, he takes as husband, and not under policy.

Where a policy of life insurance, payable to the assured's wife should she survive him, otherwise to his executors, administrators, or assigns, is by the assured delivered to his wife, with the intention that she should keep it alive by paying the premiums on it, and that it should belong to her, there is a valid parol assignment to her divesting him of all contingent interest in it, and vesting this interest in her, giving her the absolute and entire interest in the policy, so that upon. her death leaving him surviving, he would take, not under the terms of the policy, but by virtue. of his right as surviving husband. (*Post, pp.* 402-403.)

Box v. Lanier.

Cases cited and approved: Chapman v. McIlwrath, 77 Mo. 38;
Leinkauf v. Calman, 110 N. Y., 50; Thompson v. Emery, 27 N.
H., 269; Neve v. Insurance Co., 2 McMul. (S. C.), 237; Marcus
v. Insurance Co., 68 N. Y., 625; Jones v. Gibbons, 9 Vesey, 407.

3.  **HUSBAND AND WIFE.** Husband's right to wife's choses
    in action by survivorship rests on common law, and not
    statute.

The right of the husband to the choses in action of the wife by
   reason of his survivorship rests upon a rule of the common law
   of this State, and not upon any statutory enactment. (*Post,*
   *p. 403.*)

4.  **SAME. Same.** Husband feloniously killing wife cannot take
    her choses in action, nor can his representatives hold same.

The rule of the common law by which the surviving husband
   becomes the owner of his predeceased wife's choses in action
   does not apply, where he makes himself the survivor by felo-
   niously taking her life; and, therefore, in such case, his legal
   representatives cannot hold, as against her legal representa-
   tives, the proceeds of a life policy owned by her, though col-
   lected from the insurance company by his representatives.
   (*Post,* *pp. 403-413.*)

Cases cited and approved: Jacobs v. State, 3 Hum., 493; Burt
   v. Insurance Co., 187 U. S., 362; Society v. Bolland, Fauntleroy's
   Case, 4 Blye, N. R., 194-211; Riggs v. Palmer, 115 N. Y., 506;
   Woodman v. Pitman, 79 Me., 456; Cleaver v. Associaion, L. R.,
   19 B. Div., 147.

Cases cited and distinguished: Owens v. Owens, 100 N. C., 240;
   Deem v. Milliken, 6 Ohio Cir. Ct. R., 357, affirmed in 53 Ohio
   St., 668; Shellenberger v. Ransom, 41 Neb., 631; Carpenter's
   Estate, 170 Pa., 203.

5.  **SAME. Same.** And question of forfeiture provided against
    in constitution does not arise.

Where the husband feloniously kills his wife, he acquires no

Box v. Lanier.

estate in her choses in action, and therefore has nothing to forfeit in it, and the question of forfeiture provided against by the constitutional provision that "no conviction shall work corruption of blood or forfeiture of estate" does not arise. (*Post, p.* 413.)

Constitution cited: Art. 1, sec. 12.

6. **SAME.** Same. Same. **In which party's possession the funds are when suit is instituted is immaterial.**

The fact that the proceeds of the policy of insurance owned by the deceased wife were in the hands of the administrator of the husband who had feloniously killed her does not enter into the consideration and determination of the questions involved, for it is regarded and treated as immaterial, where the funds were at the time of the institution of the suit. (*Post, pp.* 406, 413-414.)

7. **COURT OF CHANCERY APPEALS.** Finding that man was "desperate" is not a finding that he was "insane."

The finding by the court of chancery appeals that one was "desperate" when he killed another is not a finding or inference drawn from the evidence in the case that he was "insane" at the time of the murder. (*Post, p.* 415.)

8. · **CONSTITUTIONAL LAW.** Provision against corruption of blood or forfeiture of estate does not involve devolution of property.

The constitutional provision that "no conviction shall work corruption of blood or forfeiture of estate" has no connection whatever with the devolution of property. (*Post, pp.* 415-416.)

Constitution cited: Art. 1, sec. 12.

9. **SAME.** Provision against attainder in federal constitution does not involve devolution of property.

The provision in the constitution of the United States (art. 1, secs. 9 and 10) prohibiting bills of attainder does not apply so as to allow the surviving husband to take the choses in action

Box v. Lanier.

of his predeceased wife, where he made himself the survivor by feloniously taking her life. (*Post, p.* 416.)

Constitution of the United States cited: Art. 1, secs. 9 and 10.

10. **ESCHEAT. None where husband is incapacitated to take wife's choses in action because he killed her.**

Where the surviving husband is incapacitated to take the choses in action of his predeceased wife, because of his feloniously killing her, there is no escheat of the property to the State, but it rests in her administrator. (*Post, p.* 417.)

11. **HUSBAND AND WIFE. Choses in action of deceased wife go to her children where the husband incapacitated himself to take same by killing her.**

Where the surviving husband made himself the survivor by feloniously killing his wife, and thus incapacitated himself to take her choses in action, the proceeds thereof should, as a matter of right, as well as of sound public policy, pass to those of her blood who stood in closest relationship with her at the time of her death, to wit, her children. (*Post, pp.* 417-418.)

12. **STATUTES. English and North Carolina as well as Tennessee statutes repealed by Code of 1858.**

All prior public and general statutes, whether English or statutes passed in this State, or brought into it from North Carolina, were in effect repealed by the Code of 1858. (*Post, pp.* 416-417.)

Code cited and construed: Sec. 58 (S.); sec. 42 (M. & V.); sec. 41 (T. & S. and 1858).

Case cited and approved: State v. Miller, 11 Lea, 620.

---

FROM HUMPHREYS.

---

Appeal from the Chancery Court of Humphreys County—J. W. STOUT, Chancellor.

Box v. Lanier.

H. C. CARTER and B. R. THOMAS, for Box.

ROBERT T. SHANNON, JOHN F. SHANNON, J. E. TUBB, and JNO. B. BOWMAN, for Lanier.

MR. CHIEF JUSTICE BEARD delivered the opinion of the Court.

This is a contest between complainant, as administrator of Mrs. Bettie W. Justice, deceased, and the defendant, who is administrator of her late husband, A. E. Justice, over the proceeds of an insurance policy upon the life of the husband. These proceeds were paid over to the defendant administrator upon an agreement between him and the complainant that this was to be without prejudice to the rights of the latter, and that they were to be held by him to await the determination of this suit.

The facts out of which this controversy grows are that on the eighth of February, 1900—about two years after the marriage of the two deceased parties—the husband obtained an insurance policy on his life in the sum of $10,000, which was made "payable to the wife of the assured should she survive; otherwise to his executors, administrators, or assigns." Immediately after its issuance the husband delivered the policy to his wife, with the statement that it was her policy, and that she must pay the premiums accruing on it. This was done by her, so that out of her own estate all of the premiums were paid by her and the policy from the time it was so de-

Box v. Lanier.

delivered to her until her death was in her possession and under her exclusive control.

The court of chancery appeals finds that the assured took out this policy for the benefit of his wife in view of her means received and used by him, and "with the intention that she should keep it alive, . . . and that it should belong to her," As confirmatory of the purpose of the husband, both with regard to the issuance and delivery of the policy to the wife, that court finds that the husband on different occasions and to different parties said that it belonged to his wife, and that these declarations, "coupled with the delivery to and the payment of all premiums by her at his request, clearly indicated an assignment by him of the policy to her; so as, under our authorities, to constitute it thereafter her separate estate."

Subsequently to these transactions, to wit, in May 1902, so obnoxious had the husband by reason of his conduct, become to his wife, she filed in the chancery court of Humphreys county, in this State, a bill for divorce, alleging as ground therefor cruel and inhuman treatment, drunkenness, and unfaithfulness to his marriage vows. It was also averred by her that he had squandered large sums of money belonging to her estate in immoral dissipation, and an injunction was prayed restraining him from disposing of certain property of which he had then possession, and also from coming to her home, or in any way interfering with her.

This bill was filed during the temporary absence of

the husband from the town of Waverly, where the parties resided. On his return, and after the service of process, he made ineffectual efforts at a reconciliation with his wife. Disappointed in these efforts, on the 19th of May, 1902, having armed himself with a pistol, he entered a place of concealment near the home of his wife, where he remained until he saw her come out, when, rushing upon her, he shot her to death, and then turning the pistol upon himself, he inflicted a mortal wound, from the effect of which he died some four hours later.

Upon this state of facts the present controversy arises. The complainant, for the estate of Mrs. Justice, insists that the policy in question was a right existing in his intestate at the time of her death, and that while, under ordinary or normal conditions, it would have vested in her husband surviving *jure mariti,* yet, inasmuch as the survivorship was brought about by his felonious act, his estate will not be permitted to make profit out of it, but the policy or its proceeds will be preserved to the representative of her estate for the benefit of her children, who are her distributees.

On the other hand, it is contended by the defendant that the representative of the husband had, by the words of the policy, a fixed right in the same, defeasible only upon the wife surviving and, if this is not so then the husband's right accrued to him *jure mariti,* and that this right should not be forfeited by the murder of his wife.

Before considering these respective contentions, it is proper to arrive at a true interpretation of the policy

Box v. Lanier.

with the view of ascertaining the respective rights of these parties at the time of the commission of the felony in question. As has already been stated, the policy was upon the life of the husband, payable to the wife upon condition that she outlived him; in other words, the title to the proceeds of the policy, if kept alive by the payment of the premiums, would have been the property of the wife in the event she outlived her husband. The right was defeasible alone upon her dying first. It was only upon the happening of this contingency that either he or his assigns or representatives would be entitled to those proceeds. It is insisted, however, that no interest by the terms of the policy accrued to the husband, but that his administrators or executors, as a special class, were to take in the event the contingency happened in the interest of his estate, but independent of him. This contention, we think, is unsound.

Mr. Biddle, in volume 1, section 287, of his work on Insurance, says: "Usually a policy taken by the insured payable to the insured's heirs, administrators, and assigns goes to the estate of the insured, and, of course, may be assigned by him in his lifetime." In support of this context the author cites the following cases which more or less go to sustain it: *Rawson* v. *Jones,* 52 Ga., 458; *Swift* v. *Rwy. Passenger, etc., Ass'n,* 96 Ill., 309; *Pilcher* v. *N. Y. Life Ins. Co.,* 33 La. Ann., 322; *New York Life Ins. Co.* v. *Flack,* 3 Md., 341, 56 Am. Dec., 742; *Winchester* v. *Stebbins,* 16 Gray (Mass.), 52; *Wason* v. *Colburn,* 99 Mass., 342; *Conn. Mut. Life Ins. Co.*

Box v. Lanier.

v. *Ryan,* 8 Mo. App., 535; *Edington* v. *Aetna Life Ins. Co.,* 13 Hun, 543; *Williams* v. *Corson,* 2 Tenn. Ch., 269.

In *Mutual Life Insurance Company* v. *Armstrong,* 117 U. S., 591, 6 Sup. Ct., 877, 29 L. Ed., 997, it seems that an endowment policy was issued upon the life of one Armstrong, in which it was agreed that the company should pay to the assured or his assigns, on the eighth of December, 1897, or if he should die before that time, to his legal representatives, the amount of the policy. It was issued at the instance of one Hunter, who paid the premium upon it, and took an assignment thereof from the assured. Soon after its issuance, Armstrong was murdered. Suspicion falling upon the assignee, Hunter, as the perpetrator of the murder, he was indicted and convicted. Subsequently he was hung. The administratrix of Armstrong instituted suit upon the policy. Upon the trial of the case, upon the assumption that the insurance money was payable, in case that death occurred before the expiration of the endowment term, to the legal representatives of the assured, and that the policy was not assignable by him, certain evidence was rejected by the court, and its action in that respect was assigned as error in the supreme court of the United States. With regard to this that court said: "The ruling cannot be upheld. The position that the assignment did not take effect because the assured died before the expiration of the policy is untenable. The provision for payment in such case to his legal repre-

Box v. Lanier.

sentatives was intended to meet the contingency of his dying without having disposed of his interest, and not to limit his power over the contract during his life, and pass the insurance to those who should represent him after his death."

We think, upon the authorities, there can be no doubt of the absolute control of the assured over this policy to the extent, at least, of the contingent interest which he had in it, and that an assignment made by him, or a disposition of it by his will, would convey to his assignee or to his legatee whatever interest might accrue to him from this policy; and we are further satisfied that his assignment by parol of the policy to his wife divested him of all contingent interest in it, and vested this interest, in addition to that she already had by its terms, in his wife, and that upon her death leaving him surviving he would take, not under the terms of the policy, but by virtue of his right as surviving husband.

That a parol assignment accompanied by delivery of the policy to the wife was sufficient to vest her with the sole interest in this policy is settled by the authorities. In *Chapman* v. *McIlwrath,* 77 Mo., 38, 46 Am. Rep., 1, it appears that the policy was made payable to the assured, his executors or his assigns. After his marriage he said to his wife that it was taken out for her benefit, and he delivered it to her, saying that it was his purpose to vest her with the title, to her sole and separate use. After this delivery it was kept by the wife in her possession until her husband's death. In a contest between

Box v. Lanier.

the creditors of the husband and the widow it was held that this was a good assignment.

Mr. Phillips, in volume 1 of his work on Insurance (4 Ed.), sec. 880, says: "Policies are usually assigned in writing, but a mere verbal assignment and delivery of the policy gives to the assignee an equitable right to the proceeds where the policy itself contains no provision to the contrary." To the same effect is Bliss on Life Insurance, 546. Many cases may be found announcing the same doctrine not only with regard to policies of insurance, but also as to other choses in action, among which are: *Leinkauf* v. *Calman*, 110 N. Y., 50, 17 N. E., 389; *Thompson* v. *Emery*, 27 N. H., 269; *Neve* v. *Charleston Ins. Co.*, 2 McMul. (S. C.), 237; *Marcus* v. *St. Louis Mut. Life Ins. Co.*, 68 N. Y., 625; *Jones* v. *Gibbons,* 9 Vesey, 407.

So it is we are satisfied that after this parol assignment of the husband to his wife, supplementing as it did the provision of the policy which made the proceeds primarily payable to her in the event she outlived her husband, that it stood at the time of her murder exactly as if it had provided originally that it should be payable to her unconditionally upon her husband's death, and that whatever right or interest accrued thereafter to him was as surviving husband.

The right of the husband to the choses in action of the wife by reason of his survivorship rests upon a rule of the common law of this State, and not upon any statutory enactment. It is impossible to concede, how-

Box v. Lanier.

ever, that the common law ever contemplated that this rule was to be applied in favor of her husband who makes himself a survivor by the felonious homicide of his wife. If, instead of paying the policy, the insurance company had resisted, and the husband or his representatives were undertaking to enforce payment upon the ground that the contract did not provide for a forfeiture of his rights on account of his felonious act, there can be no doubt upon reason and authority that his or their contention could not be maintained.

In the recent case of *Burt* v. *Union Central Life Ins. Co.*, 187 U. S., 362, 23 Sup. Ct., 139, 47 L. Ed., 216, a question akin to the one just stated was considered and determined. The facts of the case were that a policy was issued to Wm. E. Burt upon his own life, payable to his wife if living at the time of his death, otherwise to his executors, administrators, or assigns. Subsequently the assured was, upon indictment, convicted of the murder of his wife, and was afterwards hung in pursuance of the judgment of a court of competent jurisdiction.

During the lifetime of the wife one-half interest of this policy was assigned by her and her husband to the plaintiffs in the action, and after her death the assured conveyed to the same parties the remaining interest in the policy. These assigns were also the sole heirs of the assured, and as such were entitled to the full benefit of the policy, and, claiming as assigns as well as heirs, they instituted suit upon the policy. The court said the

Box v. Lanier.

question was, "did insurance policies insure against crime?" The court added: "The researches of counsel have found but one case directly in point. *Amicable Society* v. *Bolland,* decided by the House of Lords in 1830, reported in 4th Blye, N. R., 194-211. The Lord Chancellor delivering the opinion, after stating the question,* answered it in the following brief but cogent words: 'It appears to me that this resolves itself into a very plain and simple consideration. Suppose that in the policy itself this risk had been insured against—that is, that the party insuring had agreed to pay a sum of money year by year upon condition that in the event of his committing a capital felony, and being tried, convicted, and executed for this felony, his assigns shall receive a certain sum of money—is it possible that such a contract could be sustained? Is it not void upon the plainest principles of public policy? . . . . Now, if a policy of that description, with such a form of condition inserted in it in express terms, cannot, on grounds of public policy, be sustained, how is it to be contended that in a policy expressed in such terms as the present, and after the events which have happened, that we can sustain such a claim? Can we, in considering this policy, give to it the effect of that insertion which, if expressed in terms, would have rendered the policy, so far as that condition went, at least altogether void?' "

The supreme court of the United States, in an opinion embodying this quotation from the English case, and

Box v. Lanier.

after a review of the authorities, held that the suit of the assignees was not maintainable.

It is true in the present case that the insurance company made no contest, but, conceding its liability, paid over the proceeds of the policy, and they await the determination of this suit. But can it be successfully contended that a claim resting upon a felonious act which might have been resisted by the insurance company has acquired more virtue when it is now asserted by the representative of the murderer to the proceeds of that policy? Can those who represent the husband, who first by the felonious destruction of the life of his wife, and then as a *felo de se* has accelerated the maturity of the policy, take the fruits of his crime under the doctrine of *jure mariti*? It is true no case has been called to our attention where such a claim has been either asserted. or repelled. The courts have been called on to consider cases where statutory rights have been insisted on though they rested on the felony of the several parties setting them up, or by others claiming through them. *Riggs* v. *Palmer*, 115 N. Y., 506, 22 N. E., 188, 5 L. R. A., 340, 12 Am. St. Rep., 819, is one of the earliest of the cases in the United States in which this question was considered, and by a majority opinion of certainly great moral force it was held that the intention of the legislature in the general laws passed for the devolution of property by will or descent was that they should not operate in favor of one who murdered his ancestor or benefactor in order speedily to come into pos-

Box v. Lanier.

session of his estate, either as devisee, legatee, or heir at law.    As against this view, however, are the cases of *Owens* v. *Owens,* 100 N. C., 240, 6 S. E., 794; *Deem* v. *Milliken,* 6 Ohio Cir. Ct. R., 357, affirmed in 53 Ohio St., 668, 44 N. E., 1134; *Shellenberger* v. *Ransom,* 41 Neb., 631, 59 N. W., 935, 25 L. R. A., 564; *Carpenter's Estate,* 170 Pa., 203, 32 Atl., 637, 29 L. R. A., 145, 50 Am. St. Rep., 765.

It will thus be seen that the weight of judicial authority is against the holding of the New York court, and it may be conceded that the better legal reasoning is to be found in the opinions dissenting from the views of that court.   We do not think, however, that any of these cases meet or control the question with which we are now dealing, and we do not rely upon either one of them for support of our conclusion in this case.   For it may be true that it would be a stretch of judicial authority to hold that an unambiguous statute providing a line of devolution of property should be interpreted to mean that this line was to be broken upon the felonious homicide of the ancestor or testator by the one next in succession, but is this equally true as to one who rests his claim on this common-law rule?

It is universally conceded that the fundamental principles of the common law are unchangeable, yet the courts recognize the necessity of flexibility in the application of old rules to new cases, so as to enable them to adopt these rules "to the ever-varying conditions and emergencies of human society."   Thus, in *Woodman* v.

Box v. Lanier.

*Pitman,* 79 Me., 456, 10 Atl., 321, 1 Am. St. Rep., 342, it is said: "The inexhaustible and ever-changing complications in human affairs are constantly presenting new questions and new conditions which the law must provide for as they arise, and the law has expansive and adaptive force enough to respond to the demands thus made of it, not by subverting, but by framing new combinations, and making new applications out of its already established principles; the result produced being 'only the new corn that cometh out of old fields.' "

This court, in *Jacob* v. *State,* 3 Hum., 493, announces the same general doctrine in these words: "The common law of the country will never be entirely stationary, but will be modified and extended by analogy, construction, and custom so as to embrace new relations springing up from time to time from an amelioration or change of society. The present common-law of England is as dissimilar from that of Edward III as is the present state of society. And we apprehend that no one could be found to contend that hundreds of principles which have in modern times been examined, argued, and determined by the judges are not principles of the common law because not found in the books of that period. They are held to be great and immutable principles, which have slumbered in their depositories because the occasion which called for their exposition had not arisen. The common law, then, is not like a statute, fixed and immutable, but by positive enactment, except

where a principle has been adjudged as the rule of action."

It has been well said that there are certain general and fundamental maxims of the common law which control laws as well as contracts. Among these are: "No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime. These maxims are adopted by public policy, and have their foundation in universal law administered in all civilized countries." These maxims embodied in the common law, and constituting an essential part of its warp and woof, are found announced both in text-books and in reported cases. Without their recognition and enforcement by the courts, their judgments would excite the indignation of all right-thinking people. The first of these maxims is applied in order to prevent one from taking the benefit of his own fraud. Why should not the last be enforced so as to forbid a party receiving the fruits of his own crime?

The last of these maxims cannot be reconciled with the rule insisted on by the administrator of A. E. Justice. This rule, he insists, gives to him as a matter of law the proceeds of this policy. Though steeped in crime, and without reference to whether the prior death of Mrs. Justice came naturally or was the result of the felonious assault of her husband, yet his contention is that the policy with its proceeds passed *jure mariti* to this husband, and upon his death to himself as the legal repre-

.sentative. If this be true, it logically follows that, if he had killed the wife for the purpose of setting in motion this rule, and under it becoming the absolute owner of her choses in action, his common-law right would be enforced. Such a result, if essential, we think would be a reproach to the jurisprudence of the country, and should arouse the legislative conscience to speedy corrective legislation.

But we do not think that it is essential. The rule in question, though statutory in England, is a common-law rule of property with us, administered by reason of the relation of husband and wife and of the respective rights and obligations growing out of this relation. Carried to the length now insisted upon, it necessarily encounters, among others, the fundamental maxims already referred to that no man shall found a claim upon his own iniquity, or acquire property by his own crime. The rule thus contended for and these underlying principles of the common law cannot stand together. They are utterly irreconcilable if the present contention is sound. But we do not think it sound. To the contrary, we are satisfied that the rule and these maxims find their consistency in the flexibility of the common law and its power of adapting itself to new conditions and new cases. The present is one calling for a limitation on the rule in question, to wit, that it shall not apply where it is called into being by the crime of the husband. Thus qualified, there is perfect reconciliation between the rule and these maxims. Nor do we regard this as an enun-

Box v. Lanier.

ciation of a new principle just called into life, but rather, as is said in *Jacob* v. *The State,* supra, one of those "great and immutable principles which have slumbered in their depositories because the occasion which called for their exposition had not arisen" heretofore.

As was said by the court in *Mutual Life Insurance Company* v. *Armstrong*: "It would be a reproach to the jurisprudence of the country if one could recover insurance money payable on the death of a party whose life he had feloniously taken. As well might he recover insurance money upon a building that he had willfully fired." In *Cleaver* v. *Mutual Reserve Fund Life Association,* L. R., 1 Q. B. Div., 147, there was a controversy over a policy taken out by James Maybrick, a member of the association, upon his life, payable to Florence E. Maybrick, his wife, if living at the time of the death of the husband; otherwise to his legal representatives. The assured died in 1889, and after his death Florence E. Maybrick assigned by deed to Cleaver all of her interest in the policy. The controversy in the case was between the assignee, the insurance company, and the administrators of the deceased. The association undertook to resist recovery on this policy upon the fact established in the criminal prosecution against the surviving wife that the assured had died from poison feloniously administered by her. This defense, so far as the legal representatives of the deceased was concerned, was held not maintainable, but in so far as the surviving wife and her assignee the court held that her felonious act deprived

Box v. Lanier.

her of all interest in the policy, as well as one claiming through her.  Esher, M. R., said:  "The rule of public policy in such a case prevents the person guilty of the death of the insured, or any person claiming through such person, from taking the money."  Fry, L. J., in dealing with the same question in a separate opinion, used this language:  "It appears to me that no system of jurisprudence can with reason include amongst the rights which it enforces rights directly resulting to the person asserting them from the crime of that person. If no action can arise from fraud, it seems impossible to suppose that it can arise from felony or misdemeanor. It may be that there is no authority directly asserting the existence of the principle; but the decision of the House of Lords in *Fauntleroy's Case*, 4 Blye, N. S., 194, appears to proceed on this principle, and to be a particular illustration of it.  This principle of public policy, like all such principles, must be applied to all cases to which it can be applied, without reference to the particular character of the right asserted or the form of its assertion.  In *Fauntleroy's Case*, . . . it was held to prevent the assignees of a forger from claiming the benefit of a policy on his death at the hands of justice by reason of his forgery.  It would equally apply, it appears to me, to the case of a *cestui que trust* asserting a right as such by the reason of the murder of the prior tenant for life or of the assured in a policy; and it must be so far regarded in the construction of acts of Parliament that general words which might in-

Box v. Lanier.

clude cases obnoxious to this principle must be read and construed as subject to it."

We think, if it is a sound holding that one named as the payee of a policy by the felonious homicide of the assured is, with his assignee, cut off from receiving the benefit of that policy notwithstanding its expressed terms, that with much more force it can be insisted that one who claims under the common-law rule invoked in this case must be disappointed of a recovery.

This view of the case relieves us from considering the contention that to deprive the surviving husband of this chose in action by reason of his felony is to enforce a forfeiture of estate against him in the face of section 12 of article 1 of the State constitution. The application of the principle, which we hold to be fundamental and controlling in this case, intervenes between him and the property, so that he never acquired an estate and therefore forfeited nothing in it. The result is that the decree of the court of chancery appeals is affirmed.

### ON REHEARING.

Mr. Chief Justice Beard delivered the opinion of the Court.

In this case there has been presented to the court a petition for rehearing, in which we are urged to reverse the decree giving the proceeds of the insurance policy in question to the complainant. The counsel for the petitioner misapprehends the basis of the court's former

Box v. Lanier.

opinion, in that he assumes the court treated the present
suit as in the nature of a bill of interpleader, and put
the defendant in the attitude of asking active interposi-
tion of the court, when by an agreement between himself
and the complainant he was already in possession of the
fund.      This assumption would not have been made if
counsel had had before him at the time he prepared his
petition the opinion delivered by the court. In that
opinion, in a mere historic way, it was stated that the
insurance company had paid over the proceeds of the
policy to the defendant administrator upon an agree-
ment between him and the complainant that this was to
be without prejudice to the rights of the latter. No
point was made upon this, nor did the respective atti-
tudes of the two parties to this suit, or the fact that the
proceeds of this policy were in the possession of the ad-
ministrator of A. E. Justice, enter into the considera-
tion and determination of the questions that were in-
volved. Where the funds were at the time of the insti-
tution was regarded and treated as an immaterial fact.

It is also said that there is nothing in the opinion of
the court of chancery appeals that warranted the con-
clusion announced by this court that the husband's con-
tingent right in the policy was given to her. There was
nothing else that he could give. The policy was deliv-
ered to her after its issuance, and immediately upon its
receipt by the husband, with the intention that she
should keep it alive, and that it should belong to her.
The finding of that court, in language that cannot be

Box v. Lanier.

misunderstood, was that this policy was assigned by parol to Mrs. Justice, and upon this there was nothing left open for this court to determine, except the question of law, and that is whether the parol assignment of this chose in action would carry the right of the assignor to the assignee. In the third place, it is insisted that the effect of the finding of the court of chancery appeals is that the husband was insane at the time he committed the homicide upon his wife. No pretense was made in pleading, nor, so far as we can ascertain from the opinion of the court of chancery appeals in the evidence, that Justice was irresponsible at the time he perpetrated this crime. That court does find that he was desperate; but, as we understand from the use of the word, the inference that the court intended to be drawn was that finding that his wife had determined to separate herself forever from him, and withdraw her person and her estate from his protection, that he was thrown into a furious condition of mind. Evidently it was not an inference drawn from the evidence in the case that he was insane at the time of this murder.

In the original opinion it was said that it was unnecessary to consider the constitutional question raised by the administrator of Justice, for the reason that as, under our application of the common-law rule of *jure mariti*, the title to the policy never vested in the surviving husband, and, therefore, there was nothing for him to forfeit. It is said, however, that this conclusion could not have been reached by the court, except by hold-

Box v. Lanier.

ing the constitutional provision in question of no effect or as inapplicable. As above indicated, we did hold it as inapplicable, and we still maintain that view. But it is insisted that such a holding violates the spirit of section 12 of article 1 of the constitution, inasmuch as its effect is to work a forfeiture of the right to take property by devolution under the law, because of the crime committed by the husband. We do not think that such is the effect of our holding, when we simply de-clined to give the surviving husband the benefit of this common-law rule where his own criminal offense has called it into being.

The provision in question is that "no conviction shall work corruption of blood or forfeiture of estate." This provision has no connection whatever with the devolu-tion of property, but it is intended in its last clause to prevent a forfeiture of an estate of a criminal on ac-count of his offense; but we held that, under the facts found in this record, the surviving husband never ac-quired an estate in this property, and therefore there was nothing upon which this constitutional provision could operate. The same answer may be made to that part of the petition which calls the attention of the court to sections 9, 10, art. 1, of the federal constitution.

Again, it is said that the right of the surviving hus-band to take the chose in action of the predeceased wife rests, not upon the common law, but upon the statute of 29 Charles II, chapter 3, section 25, which, as we under-stand the petition, it is insisted is still in force in this

State. This question, however, was put at rest in the case of *State* v. *Miller,* 11 Lea, 620. In that case it was said that all prior statutes, whether English, or statutes passed in this State, or brought into it from North Carolina, were in effect repealed by the Code of 1858. It is conceded that the effect of section 41 of the Code was to repeal all statutes of this State and of North Carolina theretofore in operation in Tennessee, but it said that this repeal was confined alone to those statutes. It certainly would be an anomalous condition, if all domestic statutes were extinguished by the adoption of the Code of 1858 and antiquated foreign statutes were left in operation in this State. We do not think the revisers of the Code, or the legislature in adopting it, intended that such a condition should exist; and, whether dictum or not, we are entirely satisfied with the conclusion announced by the court just referred to.

Nor do we think that the result of the opinion complained of, in incapacitating the surviving husband to take this chose in action because of the homicide, is to escheat the property to the State. Because, unquestionably, if the administrator of Justice is not permitted to take the title of the property, it became vested in the administrator of Mrs. Justice upon her death, and from him passes to the distributees of her estate. Nor is there inequity in this. She paid every premium on this policy from the time it was taken out up to her death. She was put in possession of it, with the statement

Box v. Lanier.

made by her husband that it was taken out for her, and was her property, to be kept alive by her with her own money, and she died with it under her dominion. We think that every legal and equitable consideration tend to support the claim of her administrator, and that, as a matter of right, as well as of sound public policy, the proceeds should pass to those of her blood who stood in closest relationship with her at the time of her death, to wit, her children, rather than to the representatives of one whose claim rests alone upon his felonious act, and from him to aliens in blood to Mrs. Justice. The petition is dismissed.

### DISSENTING OPINION.

MR. JUSTICE WILKES delivered the following dissenting opinion:

I cannot agree with the result reached by the majority of the court. I agree with their holding that a policy taken out by the insured, payable to his administrators and assigns, goes to the estate of the insured, and may be assigned by him in his lifetime. To that extent the insured has control over it. But if he does not assign it in his lifetime, it passes to his estate, not by descent, but by the terms of the policy.

I am also of the opinion that the policy or interest of the assured thereunder can be assigned by parol and delivery, and such assignment will be good against the beneficiary in the policy, if so intended. But I do not understand that the husband in this case assigned his

Box v. Lanier.

remainder or contingent interest in the policy, or the interest of his estate, to his wife; nor do I understand the court of appeals to so find. On the contrary, he assigned and delivered the policy, as issued to her, to be held by her, and to take effect according to its terms and provisions; that is, she took an interest in it, contingent upon her surviving her husband, and not otherwise, and he held an interest contingent on his surviving her. Waiving the question whether he could, before her death, assign this merely contingent interest, it is sufficient to say he did not do so, nor attempt to do so, and the court of chancery appeals so finds. He intended when he delivered the policy to her that she should take according to its provisions, and not otherwise. There is no indication to the contrary, and the court of chancery appeals does not so find. If there was, it could not prevail against the terms of the policy.

Now, if she had died a natural death, and he had afterwards died without assigning the policy, there can be no doubt it would have gone to his administrator or executor, by the terms of the policy, to be disposed of as the statute provides in cases of distribution. In other words, he or his administrator would have taken under the policy, and not *jure mariti*.

The fundamental error in the opinion of the majority, as I see it, is in holding that Mr. Justice, when he delivered the policy to his wife, intended to vest in her his contingent interest under it in the event he should survive her. I do not find any warrant for this in the find-

Box v. Lanier.

ings of the court of chancery appeals, nor could it have so found in the face of the provisions of the policy, and I think all the circumstances show that he did not so intend, but merely intended that she should take the policy, and hold under it according to its terms. If he had intended to vest in her an absolute interest in the proceeds, without limitation, condition, or contingency, he would have caused the policy to be so worded that in any event she would get the proceeds; that is, he would have made it payable to her, or he would have made a written indorsement indicating his purpose to transfer his interest and invest in her the absolute and sole right to the proceeds, without condition, contingency, or limitation. He did neither of these things, but merely delivered the policy to her, and she received it according to its terms, and so held it, and could not hold it except according to its terms, and by those terms she had only the contingent interest which depended upon her surviving her husband. There is nothing to show that his contingent interest was cut off, or intended to be cut off, by the delivery of the policy to the wife. The logical inference is to the contrary, and so is the finding of the court of chancery appeals.

The naked question involved in this case is whether the fact that Mr. Justice killed his wife can change the terms of this policy, and the statute which provides how the proceeds shall go, not whether he could recover from the insurance company. The company has already paid

Box v. Lanier.

the money to his administrator, without contest or question.

Now, it is true that it shocks the sense of mankind that a person shall become a beneficiary or hasten a beneficial interest by means of the crime of murder. It may be that the legislature should provide against such a contingency, but I am of the opinion the courts cannot do so.

It is an old maxim that hard cases make bad law, and I fear that the truth of the maxim is illustrated in the result reached in this case, as was done in the case of *Riggs* v. *Palmer,* 115 N. Y., 506, 22 N. E., 188, 5 L. R. A., 340, 12 Am. St. Rep., 819, cited and relied on in the opinion of the majority, but which was afterwards modified in *Ellerson* v. *Westcott,* 148 N. Y., 149, 42 N. E., 540, and which had been disapproved and repudiated by the latter and better-considered cases of *Owens* v. *Owens,* 100 N. C., 240, 6 S. E., 794; *Deem* v. *Milliken,* 53 Ohio St., 668, 44 N. E., 1134; *Shellenberger* v. *Ransom,* 41 Neb., 631, 59 N. W., 935, 25 L. R. A., 564; *Carpenter's Case,* 170 Pa., 203, 32 Atl., 637, 29 L. R. A., 145, 50 Am. St. Rep., 765.

I agree with the majority in its view that the rules of the common law are flexible, and adapt themselves to the new and changing conditions and emergencies of society; but they cannot and did not go to the extent of overriding, repealing, and nullifying the provisions of our statutes, or changing the laws of descent and distribution.

Box v. Lanier.

The devolution and distribution of personal property is a matter which is regulated by statute, and the statute cannot be set aside to meet hard cases, or to administer a higher and moral law in its stead.

But it is evident that no such great outrage upon our sense of natural justice can result from allowing the law to take its course in this case as is intimated in the opinion of the majority.

Mr. Justice, the murderer, is not suing in this case, and he can in no event be benefited personally by the proceeds of this policy.    He has eliminated himself from the whole transaction by his own suicide.    The proceeds of the policy do not go to him.    They go to his administrator, and through that administrator, to his next of kin, or, in default of next of kin, under the statute, to his creditors.    Neither the next of kin nor the creditors were "*particeps criminis*" with him in the commission of his crime, and in thereby bringing the policy to maturity.    There is no ground, in law or morals, why they should be punished for his criminal act.    Their hands are not stained with the blood of Mrs. Justice.    They should not be punished for her death.    In this connection, it may be well to remark, also, that Mr. Justice did not kill his wife to obtain the insurance.    No such thought was in his mind. He killed her in sheer reckless, it may be insane, desperation over her attempt to procure a divorce.

I do not think the cases of *Mutual Life Ins. Co.* v. *Armstrong,* 117 U. S., 591, 6 Sup. Ct., 877, 29 L. Ed.,

Box v. Lanier.

997, and *Burt* v. *Union Central Life Ins. Co.,* 187 U. S., 362, 23 Sup. Ct., 139, 47 L. Ed., 216, cited by the majority, are controlling, or even in point, in the present case.

In those cases the contest and question was between the insurance companies and the beneficiaries under the policies, as to whether the companies could be made to pay the policies.

In this case the insurance company has made no contest, but has paid the proceeds into the hands of the administrator; and the question now is not whether the parties entitled shall be allowed to recover, but whether, having the fund in possession, it shall be confiscated and taken away from them.

In the Armstrong case-it appears that the policy upon Armstrong's life was assigned to Hunter, who was a creditor of Armstrong's. Hunter also procured insurance upon Armstrong's life in other companies, and afterwards murdered him in order to obtain the insurance. The insurance company refused to pay the policy on account of the fraud perpetrated upon it in obtaining the insurance for the purpose of killing the insured and obtaining the money. It was held that Armstrong's administrator could not recover, because in order to secure its immediate payment, the beneficiary murdered the insured. This was, as before stated, a contest between the administrator of the assured and the insurance company as to whether the company could be made to pay.

In the latter case of *Burt* v. *Union Central Life Ins.*

Box v. Lanier.

*Co.,* 187 U. S., 362, 23 Sup. Ct., 139, 47 L. Ed., 216, the contest was also between the assignee of the murderer and the insurance company as to whether the latter could be required to pay the policy by the beneficiary, who had accelerated the maturity of the policy, or his assignee; the assignment being made after the killing had been done.

The insured was legally executed for the killing of his wife, and the holding of the court was that the policy did not insure against his legal execution, and, if his death was the result of a legal execution, then the condition of natural death in the policy, upon which it was to become payable, had not accrued.

In the opinion of the majority it is asked if it can be successfully contended that a claim resting upon a felonious act, which might have been resisted by the insurance company, had acquired more vigor and more virtue when it is asserted by the murderer's representatives, to the proceeds of the policy. We answer that we think such a contention is not only entirely tenable, but wholly legal and logical. It is not the case of the murderer taking the fruits of his own crime. The administrator does not hold under the murderer, nor for his benefit. He holds under the terms of the policy, and for the benefit of the next of kin or creditors of the assured, who are not, or should not be, in any way affected by the crime of the assured. The right to the proceeds does not come to the administrators or next of kin or creditors through any assignment of the murderer, or

Box v. Lanier.

any descent from him, but solely under the terms of the policy, and the statute applicable thereto. They do not take and do not hold under the murderer, but under the policy, and are innocent of all crime and all bad faith.

To hold with the majority is, in truth, to visit upon the children the iniquities of the father, which human law does not do, whatever may be the rule of the divine law.

In the present case the proceeds of the policy are in the hands of the administrators of the husband, where, under the law, they should be. All defenses of the insurance company have been eliminated from the controversy. The administrators do not seek or need the aid of the court to get possession of the fund. They have it already, and the only question now is to whom should it be paid. The statute says to the next of kin, or, in default of next of kin, to the creditors. But the opinion of the majority says: "No, we will not allow it to go as the statute says and provides, but will give it to the representatives of the murdered woman, who never took any interest in it, because the condition on which she was to acquire an interest never happened." Not only is the property taken away from the husband's estate, but it is attempted to be given to the wife, who can in no event have an interest in it.

No interest ever vested in her, except the contingent one fixed by the policy, which was extinguished by her dying before her husband. None ever vested in her husband *jure mariti*, because his wife never had a vested

Box v. Lanier.

interest. None vested in him after her death, because he did not assign or transfer the policy, or exercise any act of ownership over it, but left it to pass by its terms to his administrators, for the use of his next of kin or creditors.

But if the majority is correct in holding that the entire interest in the policy vested in Mrs. Justice when it was delivered to her, still I am of opinion the majority is incorrect in its conclusions.

If she died the absolute, unconditional owner of the policy, and it would have passed to her husband *jure mariti* in the event of her natural death, the fact that she was killed by her husband would not cut him off from such right if he were alive. Much less will it cut off his administrator, who already has the fund in his hands, and does not need the aid of the court in any way, but simply holds it to be paid out as the law provides—to the next of kin, if any, and, if none, then to the creditors, under statute. The marital rights of the husband are protected by the statute 29 Charles II, chapter 3, section 25, and this statute became a part of the law of this State. This marital right is recognized also by a number of our own statutes—notably the Act of 1875, chapter 89, and Act of 1877, chapter 79 (Shannon's Code, sections 4237, 4238).

Can the court change the rule of the common law in regard to inheritance in order to punish a criminal offense?

The question is directly considered in the case of

Box v. Lanier.

*Owens* v. *Owens,* 100 N. C., 240, 6 S. E., 794.   In that
case it is said :

"Is the right of the wife to share in the personal es-
tate of her husband as distributee lost or affected by
the fact that he died at her hands or through her pro-
curement?   Does the child who slays a parent thereby
lose the right to participate with his brothers and sis-
ters in the distribution of the personal estate, or to take
his part of the descended real estate?   Reversing the
matter, does the husband who kills his wife impair his
right under the statute of distribution to succeed to the
ownership of her personal property left after payment
of her debts; or, in general terms, does any one, as a
consequence of an unlawful taking of human life, be-
come thereby disabled to take a part of the estate left
by the deceased, which the law gives him subject to no
such conditions.

"Forfeitures for crime are unknown to our law, nor
does it intercept for such cause the transmission of an
intestate's property to his distributees, nor can we rec-
ognize any such operating principle.

"No well-considered case can be found holding a doc-
trine contrary to this.

"The language of Mr. Justice Field in *New York
Mutual Life Ins. Co.* v. *Armstrong,* 117 U. S., 591, 6
Sup. Ct., 877, 29 L. Ed., 997, in which he holds that
Hunter, the murderer, could take nothing under the
policy, is a pure dictum, as neither Hunter, nor any one

Box v. Lanier.

representing him, was before the court in that case; and it was not the question involved in the case.

"It was this error in the opinion of Mr. Justice Field that misled the court in *Riggs* v. *Palmer,* 115 N. Y., 506, 22 N. E., 188, 5 L. R. A., 340, 12 Am. St. Rep., 819."

See *Shellenberger* v. *Ransom,* 41 Neb., 646, 59 N. W., 935, 25 L. R. A., 564.

In the latter case the question was fully considered, and the case reviewed, and the former holding of the Nebraska court is reversed.

The case is too long to be copied, but there are so many pertinent points and suggestions in it that we refer to some of them.

In regard to *Riggs* v. *Palmer,* relied on by the majority, it says, in substance, that the reasoning in that case was founded very largely on that species of judicial legislation characterized as "rational construction," and was based upon the civil law and Code Napoleon, and not in common-law rules and maxims.   41 Neb., 641.

But, says the court, our laws of descent contain no such provisions as the Code Napoleon or the civil law, to wit, that one cannot take property by inheritance or will from an ancestor or benefactor whom he has killed.

It was further said that this resort to the Code Napoleon was made because the result could not be reached by the rules of the common law, and that the opinion was confessedly judicial legislation.

The opinion, reasoning, and conclusion of the court

Box v. Lanier.

was strongly condemned, and it has not been followed, even in New York.

It was further said, in commenting on that case, that it seems to have been largely prompted by the horror and repulsion with which it may be justly supposed the framers of our statute would have viewed the crime and its consequences if they had had it in mind.

"But," says the Nebraska court, "this is no justification to this court for assuming to supply legislation, the necessity for which had been suggested by subsequent events, but which did not occur to the minds of those legislators by whom our statute of descent was framed. Neither the limitations of the civil law nor the prompting of humanity can be read into a statute from which, without question, they are absent, no matter how desirable the result to be attained may be. The facts of the case may impress on some future legislature the necessity of an amendment of our law of descent. From that source alone can such an amendment come."

The cases of *Riggs* v. *Palmer*, of *New York Mutual Life Ins. Co.* v. *Armstrong*, of *Owens* v. *Owens*, and of *Deem* v. *Milliken* are all carefully analyzed and reviewed by the Nebraska court, and the conclusion is expressed in these words: "The well-considered cases warrant the pertinent conclusion that when the legislature, not transcending the limits of its power, speaks in clear language upon a question of policy, it becomes the judicial tribunals to remain silent. The decision in *Riggs* v. *Palmer* is the manifest assertion of a wisdom

Box v. Lanier.

believed to be superior to that of the legislature upon a question of policy."

The case of *Carpenter's Estate—Carpenter's Appeal,* 170 Pa., 206, 32 Atl., 637, 29 Atl., 145, 50 Am. St. Rep., 765, is also directly in point. In that case it was sought to deny a son any share in his father's estate because he had murdered him in order to secure such estate. The court held that it could not be done, and the crime committed could not attaint the blood or change the law of distribution.

The court said, in substance: "We are unwilling to exclude the son, because we have no power to do so. From what source is it possible to derive such a power? The law casts the estate on certain persons, and this is absolute and peremptory, and the estate cannot be diverted from these persons and given to others without violating the law.

"It is the act of law which casts the descent of estates, and it cannot be regulated or controlled by the acts, the follies, the frauds, or the crimes of individual persons."

The authorities are all reviewed. *Owens* v. *Owens, Deem* v. *Milliken,* and *Shellenberger* v. *Ransom* are approved, while *Riggs* v. *Palmer* is repudiated, and *Ins. Co.* v. *Armstrong* is shown to be not in point.

I can add nothing to the reasoning and sound law of these cases, and I have no power to disregard these principles and rules of law.

If Mrs. Justice died the beneficiary in this policy, and her husband was entitled to its proceeds *jure*

Box v. Lanier.

*mariti,* and the fund is in the court, in the hands of the husband's administrator, to be paid to the party entitled, it cannot be withheld from the husband's next of kin or creditors unless the law is ignored, and the rules which govern the devolution of property are disregarded; and this upon the theory that this court can in this way punish the husband for his crime.

I most respectfully dissent from such conclusion.

But, if this could be done, it still does not reach the merits of this case.

The husband is not a party to this suit. His next of kin and creditors are the persons who are interested. Upon what principle can they be punished for the crime of Mr. Justice?

The law cast the title to the property upon him, whether by statute or common law. It vested in him, and can only be divested out of him by declaring it forfeited in the hands of his innocent representatives.