# Richmond

## Irving Floyd Clarkson v. Frank A. Bliley, Etc., and Others.

April 22, 1946.

Record No. 3027.

Present, All the Justices.

The opinion states the case.

*Montague & Montague*, for the appellant.

*M. J. Fulton*, for the appellees.

Browning, J., delivered the opinion of the court.

The appellee, Mr. Bliley, an undertaker, filed a bill against Mr. Montague, Admr. of the Estate of Annie A. Clarkson, deceased, the purpose of which was to settle her estate. It was alleged that decedent left a small amount of personal property, insufficient to pay debts and that it was necessary to sell the decedent's real estate in order to have settlement of the estate.

The parties, defendant, included Mrs. Clarkson's heirs as well as her alleged "adopted son", Irving Floyd Clarkson.

The bill also alleged that Mrs. Clarkson had acquired title to the real estate under the second item of the will of her husband, M. F. Clarkson, who predeceased her.

The title to the real estate, which the creditors claim belonged to Mrs. Clarkson, depends upon the interpretation of her husband's will. Under the second paragraph of the will he devised to her all the "rest and residue" of his estate,

real and personal, "in fee simple and absolutely". Under the fourth paragraph of the will he undertook to leave to his wife's nephew, Robert Henry Brooks, in trust for his children, and to the executor's "foster son, Irving F. Clarkson after all debts of my wife are paid to share equally in real and personal estate."

The creditors contended that under this will Mrs. Clarkson took the real estate in fee simple, while Irving Floyd Clarkson, the alleged adopted son, claimed that she acquired only a life interest in it. The trial court held that Mrs. Clarkson took, under item second of the will, a fee simple. Mrs. Clarkson died intestate. The court further held that Irving Floyd Clarkson was not entitled to receive any of the property of Annie Amelia Clarkson and further decreed that the same passed to her blood relatives and next of kin as provided by the statute of descents and distributions.

Irving Floyd Clarkson appeals, claiming:

(1) That although he was never legally adopted, Mrs. Clarkson treated him as her son, and he was entitled to inherit from her.

(2) That he was entitled to enforce the contract of adoption which Mr. and Mrs. Clarkson had made for his benefit.

The learned and able Chancellor wrote an opinion which states his conclusions as to the issues in this case.

His views and his reasons therefor, we think, are so eminently correct and able that we adopt his opinion in toto as our own.

"The first point to be disposed of is the proper construction of the will of Milton Floyd Clarkson, dated November 24, 1928, probated December 3, 1940.

"The will is holograph and indicates upon its face, despite the employment of legal phraseology, that it was prepared and executed by the testator without the supervision of a lawyer. After the usual introduction, including the revocation of previous wills and provisions for payment of debts, the will provides:

" 'Second, I give devise and bequeath all Insurance rest

and residue of my Estate real and personal all Household furniture and Jewelry to my Devoted Wife Annie Amelia Irving Clarkson in fee simple and absolutely.'

"The next item, designated 'third', appoints his wife as executor without security; and then the will continues as follows with another item designated 'third':

" 'Third, I desire if my foster son decides to make a man of himself and proves kinde to his Mother Mrs. Annie Amelia Irving Clarkson that at her Death she will remember him.

" 'Fourth, I desire that My Wifes Nephew Robert Henry Brooks in trust for his children receive with my foster son Irving F. Clarkson after all debts of my wife are paid to share equally in real & personal Estate.

" 'Fifth I desire enough money set apart to close the lot at Hollywood with concreat.'

"It is contended that this will creates a life estate with power of disposition in the wife, followed by a remainder, as to the property not disposed of by her, in equal shares to the foster son and to Brooks as trustee for his children; and that the remainder is saved by Code Section 5147, which modifies the rule of *May* v. *Joynes.*

"But this saving statute by its express terms applies only when there is a life estate in the first taker. It is not applicable when the estate of the first taker is a fee, whether created by express words (as in the instant case) or by implication. If a fee be given the first taker, then the attempted limitation over is void for repugnancy. So well settled is this doctrine in Virginia that it is not deemed necessary to consider other serious difficulties that would be met if it were attempted to sustain the limitation over under this particular will; such as the conflict between items third (the second item 'third') and fourth with respect to the foster son's sharing, and the vagueness as to the subject matter of item fourth.

"The authorities are numerous. The following will suffice:

"*Skinner* v. *Skinner,* 158 Va. 326, 163 S. E. 90.

"*Southworth* v. *Sullivan*, 162 Va. 325, 173 S. E. 524.
"*Moore* v. *Holbrook*, 175 Va. 471, 9 S. E. (2d) 447.
"*Rule* v. *First Nat. Bank*, 182 Va. 227, 28 S. E. (2d) 709.

■ "It is accordingly held that in the instant case the testator's wife took in fee the property given her by item second of the will.

■ ■ "But the doctrine under which this conclusion is reached does not preclude an inquiry as to what was so given. There is nothing in this doctrine that disables a testator from cutting down by other provisions of his will the subject of the gift in fee. And it is immaterial whether such provisions precede or follow the gift in fee. That a gift in fee by an earlier clause may be 'cut down', so to speak, by subsequent provisions is obvious when we reflect that this is the usual and normal way a codicil operates. The doctrine of *May* v. *Joynes* is founded upon repugnancy. It is simply that, with respect to what is given in fee, any subsequent limitation over as to that property is void. It is still open to construction, from consideration of the whole will and everything within its four corners, what property is the subject matter of the gift in fee.

"The gift in fee here is of the 'rest and residue of my estate'. It follows a direction that debts be paid and may mean all that is left after such payment; or it may mean the technical residuum, that is, what is left after all special provisions are met. This is, in my judgment, immaterial; for, as I view it, the subject matter of this gift to the wife in fee must be ascertained upon consideration of the whole will. If, for instance, a pecuniary legacy be made by a provision of the will, either preceding' or following the general gift in fee,—or, for that matter, in a codicil,—then such pecuniary legacy would be construed as taking precedence over the general gift; and to the required extent the general gift would be cut down. This has nothing whatever to do with cutting down a gift in fee by repugnant provisions. There is no repugnancy; for what is given by the special legacy, pecuniary, specific or whatever it may

be, is simply no part of the property passing under the general gift in fee.

    "For these reasons I am of opinion that item fifth of the will, in which the testator directs the enclosure of the burial lot, is to be complied with; and the cost of accomplishing this will be a charge against the proceeds of the real property to be sold in this cause, taking priority over the funeral expenses and all other debts and charges against the estate of Annie Amelia Clarkson; because this real property came to her under her husband's will already charged with this obligation.

"This leaves for determination the devolution of the estate of Annie Amelia Clarkson, she having died intestate. Does it pass by inheritance to the 'foster son', Irving F. Clarkson, or to Mrs. Clarkson's nearest blood kin?

"Irving F. Clarkson was born on May 20, 1908. Nothing is known of his parents or other relatives. Mrs. C. F. Salmon, a widow, took him from an institutional home when he was less than a month old, 'adopted' him (no legal adoption has been proved), cared for him through a serious illness, and died before the baby could walk. Realizing her own condition of health she tried shortly before her death to get someone to adopt him. During Mrs. Salmon's last illness Miss Martha E. Walker and her mother took care of the baby; and on the morning of the day of Mrs. Salmon's death the mother (Mrs. Walker) told her 'she would take the baby and see that he got a good home'. Miss Walker and her mother were unable to keep the baby themselves and advertised for someone to adopt him. Mr. and Mrs. Clarkson applied and some days later Mrs. Walker 'decided (they) would be good to the baby and agreed to let them have him'.

"The claim of Irving F. Clarkson to inherit the estate of Annie Amelia Clarkson is predicated upon an agreement on the part of Mr. and Mrs. Clarkson to legally adopt him; it being contended that such an agreement is specifically enforceable to the extent that a court of equity will recognize the property rights of the child to be the same as if

the agreement to adopt had been consummated. An array of authorities from other states have been produced in support of this contention and the Commissioner in Chancery has upheld the claim. The question now comes before the court upon exceptions to this holding of the Commissioner.

■ "What has been stated above is the only evidence that can be fairly said to sustain, or even to point to, any agreement on the part of the Clarksons to legally adopt the child. A number of witnesses, including Miss Walker (the daughter whose testimony has just been quoted), testified that Mr. or Mrs. Clarkson, or both, stated on a number of subsequent occasions that they had 'adopted', or 'legally adopted', him; and Clarkson, who is now about thirty-seven years of age, testifies that, though he never saw any adoption papers, he 'just heard my father say the papers would be in Chesterfield Courthouse'. These subsequent statements, for what they may be worth when considered along with the provisions of Mr. Clarkson's will, which points strongly to the contrary, do not tend to establish any agreement to adopt; at most they merely point to the fact of adoption. But the fact of formal legal adoption cannot be thus established. The Clarksons always resided in this immediate vicinity; and it is not suggested that there has been any loss or destruction of court records during the period of this child's minority. These subsequent statements would seem to be irrelevant; for the case has been submitted to the Commissioner in Chancery and to court upon a concessum that there never were any legal proceedings in which the Clarksons adopted the claimant as their son

"The claim of Irving F. Clarkson might, in my judgment, be disposed of upon the ground that, even if it were conceded that the right to inherit may be created by a private contract to adopt, the proof adduced in the instant case is too vague and unconvincing to establish the existence of such a contract.

■ "But I prefer to put the decision upon a broader ground; for, in my opinion, the right to inherit as an adopted child cannot in Virginia be created by a private contract,

the statutory steps being absolutely essential to the creation of the artificial relationship of parent and child, out of which relationship alone the mutual rights of inheritance spring.

"This is not to say that property rights of a child may not be recognized and enforced, either by way of specific performance or damages for breach, when such rights are derived from a legal contract, made for the child's benefit and founded upon a valuable consideration, whereby, in return for the surrender of the custody and control of the child, one binds himself to leave the child a certain portion of his estate. With authorities so holding I have no quarrel. But a contract merely to adopt a child cannot be reasonably construed as conferring upon such child the right to succeed to any part of the estate of another. It could not be so interpreted, for the reason that a parent has a perfect right to make a will whereby any child, natural or adopted, may take nothing; and no serious legal contract, intended to benefit a child by entitling him to succeed to property, would be entered into in such form that the party designed to be bound is left with the right, as well as the power, to render it nugatory. It cannot be reasonably contended that the parties to such a contract had in contemplation the creation and fixing of legal rights to succeed to property. It would be an agreement wholly inadequate to effectuate any such intention.

"Moreover, in the matter of inheritance there is no place for equitable considerations, whether springing from contract or from a course of conduct. Based upon the assumption that the 'blood' of a child is derived in equal parts from the two parents, our law of inheritance, by ascending the generations one step at a time, and from each point of vantage looking, first around and then down the generations, for existing takers, proceeds by fixed mathematical laws to determine the takers and the proper fraction of each. There is no flexibility in this statutory process of tracing the 'blood'; and no room for the exercise of any equitable or judicial discretion. As the power to transmit is a matter of grace rather than of right, so the capacity to take is a matter

of grace, having nothing whatever to do with merits or deserts. And there are but two exceptions in the case of adult decedents to this following of the channel of the blood, rigidly fixing the terms of the will that the law writes for an intestate; one, in the case of husband and wife, and the other in the case of adoption.

"The first exception recognizes a relationship which existed at common law; the second, a relationship that was unknown to our common law. Both are now regulated by statute; and neither relationship or status can exist without substantial compliance with the statutory requirements.

"The process of adoption is not a formality. The steps in the process must be complied with, at least substantially; and the approval of the court of adoption, evidenced by its decree, is emphatically a judicial, and not a ministerial, act. The new relationship is founded upon the preceding actions of the parties; but it is created by the court's decree and that alone. Code Section 5333h is our present law on the subject; and as respects the point now under discussion the law has undergone no substantial change since the birth of the child here in question. It is not unusual for the court to deny the petition for adoption, thus declining to create the relationship; and in such event, however solemn may have been the contract to adopt, it could hardly be contended that there is that relationship out of which alone a right of inheritance can spring.

"I have found no allusion in any of the cases to some strange results that might follow from permitting the right to inherit to be based upon a private contract to adopt. This right is mutual; if the child will inherit from the adoptive father, then the father will inherit from the adopted son. Would it be contended that a man who has failed to carry out a contract to adopt a child will inherit from that child? This would be strange; yet to inherit, the taker must be the 'child' in the eye of the law,—and he cannot be the 'child' unless the other be the 'father'. Furthermore, can a childless man by contract to adopt a babe in arms reduce his wife's share in his estate from the whole to one-third? Suppose she

united in the contract to adopt, as of course she must, and the proposed adoptive father should die intestate shortly thereafter and before consummating the adoption,—would it be held that this babe in arms acquires by virtue of the contract two-thirds of the husband's personal estate and all his real property, subject to the wife's dower?

"It is the judgment of the court that the statute of descents and distributions may not thus be altered by private contract, whether written or oral; that rights of inheritance cannot be left uncertain and dependent upon evidence of private, and perhaps secret, agreements. As I see it sound public policy imperatively demands that no such doctrine be sanctioned. It would be violative of the deepest instincts of our people and contrary to our fundamental institutions.

"Around the devolution of estates of decedents the law has thrown its most jealous safeguards; witness the stringent and strictly enforced requirements with respect to the mode in which wills must be executed, and the fixed and rigid provisions of the statute of descents and distributions, to which allusion has been made. No device whereby these safeguards may be weakened should be recognized or for a moment tolerated. At the very first attempt to assert a right of succession to any part of a decedent's estate by any person claiming in any capacity other than that of a beneficiary under a lawful will, or heir or next of kin if there be no such will,—this firm assertion of denial should be made; not only to dispose of the claim then before the court but to discourage the assertion of such claims by others, whether in good faith, as is obviously true in the case at bar, or fictitious, as the circumstances of death and secrecy might well invite if the door should be left ajar.

"A word more may be said with respect to the power and the zeal of a court of equity to alleviate hardship in a particular case. Some things are beyond the aid of equity; and in my judgment, properly so. For instance, equity cannot complete an incomplete gift, no matter how clear the donor's intent or how meritorious the donee's claim. And no one would claim that equity could reform or

aid an improperly executed will, no matter how clearly and emphatically the testamentary intent might be expressed; it is ineffectual unless it be expressed in form and manner as required by the statute. It is equally clear to me that equity cannot consummate, or treat as consummated, an adoption which has stopped short of the decree by which alone the status of parent and child is established.

"Every consideration of public policy that induced our Court of Appeals to deny the validity of the common law marriage operates with equal, or even greater, force against recognizing a contractual 'adoption'. And much of the reasoning upon which *Offield* v. *Davis*, 100 Va. 250, 40 S. E. (2d) 910, is based, and not a little of the language there used by the Court of Appeals, is apposite in this connection. After quoting the following from a Michigan case:

" 'It is sufficient that a man and a woman of due competency, and in respect to whom no impediment exists, consent to take each other as husband and wife, and actually cohabit as such,' the Court says on pages 260 and 261:

" 'Were our statute on the subject of doubtful interpretation, we could never give our assent to this doctrine. It is wholly at variance with the ideas of our people as to the requisites of a valid marriage. The question before us involves the best interests of society, the preservation of home and family, the foundation of all society.

" 'That no case has ever come to this court before the one we have under consideration, involving the question whether or not a common law marriage is valid in this State, is strongly persuasive that our people, from the passage of our earliest statutes on the subject of marriage, have interpreted them as mandatory, and as wholly superseding the common law on the subject.'

\* \* \* \* \*

" 'However this question is decided, it may result in hardship in some cases, but we think the lesser injury will come from an adherence to the statutory requisites than otherwise, to the end that these contracts should be made permanent,

and not revocable at the will and pleasure of the parties; that parents may be made responsible for the support, maintenance, and care of their offspring, and the legitimacy of the offspring established beyond dispute.'

"For these reasons the Court sustains the exceptions to that portion of the report of the Commissioner in Chancery which holds that Irving F. Clarkson is entitled to receive the property of Annie Amelia Clarkson, deceased; and a decree may be prepared sustaining the claims of her blood relatives and next of kin, determined as provided by the statute of descents and distributions; which decree will make this opinion a part of the record in this cause."

We affirm the decree of the Chancellor.

*Affirmed.*