## COUCH v. COUCH et al.—248 S. W. (2d) 327.

Eastern Section. November 13, 1951.

Petition for Certiorari denied by Supreme Court, March 7, 1952.

466

McAllester & McAllester, of Chattanooga, for appellant.

Wilkerson & Wilkerson, of Chattanooga, for appellee.

ANDERSON, P. J. The complainant, Wallace Owen Cawood Couch, was born out of wedlock. The late Wiley O. Couch was his father, and Anna B. Cawood, who later became Mrs W. C. Prendergast, is his mother. Mr. Couch died testate and by his will bestowed his entire estate upon others without mentioning the complainant. By this bill the latter claims a right to participate in the estate. The record presents two theories for the claim; (1) that complainant was not only the natural son of Mr. Couch, but after the making of the latter's will became an adopted son by virtue of a contract between his father and his mother, and is therefore entitled to the rights given by Code Section 8131 to an afterborn pretermitted child of a testate; and (2) that by said contract of adoption Mr. Couch became additionally obligated to leave complainant a child's share of his estate.

The material defendants are the devisees and legatees under the will of Wiley O. Couch, including his widow to whom he left the bulk of his estate. Certain other parties are named as defendants, but their identity is not pertinent to any question in the case.

Upon the final hearing the Chancellor dismissed the bill and the complainant appealed.

Mr. Couch died on April 4, 1947. His will was executed in November, 1926. He made two specific bequests of $1,000 each to certain institutions and bequests to cer-

tain nephews and nieces. All the remainder of his estate he left to his wife, Mabel B. Couch. No mention was made of the complainant who was born on January 17, 1910, in Covington, Kentucky. The contract by virtue of which he claims the right to participate in the estate was entered into in Atlanta, Georgia, on the 10th day of July, 1929. It is in writing and in full is as follows:

"Contract of Adoption

Georgia, Fulton County

Know All Men By These Presents, that, I, Wiley O. Couch, of Chattanooga, Tennessee, do hereby adopt, one, Wallace Owen Cawood, as my child. Said child is a minor, his age being nineteen years.

1. That said minor child is hereby adopted by Wiley O. Couch, and shall now and forever afterwards be known by name as Wallace Owen Couch.

2. That said child will inherit, from my estate or estates, in whole or in part, as any other son or child of said Wiley O. Couch.

3. In consideration therefor, I, Wiley O. Couch, further agree to provide said son, Wallace Owen, with the necessaries of life.

Given under my hand and seal,

Wiley O. Couch

This 10th day of July, A.D. 1929.

The foregoing Contract of Adoption having been read, Mrs. W. C. Prendergast, formerly Anna Beatrice Cawood of Knoxville, Tennessee, who states she is the mother of said minor son, Wallace Owen Cawood, and that said adoption is fully approved by her, and she feels is altogether proper and conducive to her son's welfare and interests.

Under her hand and seal.

Mrs. W. C. Prendergast

formerly Anna B. Cawood

This 10th day of July, A.D. 1929."[1]

At the time of his death Couch occupied the position of County Judge of Hamilton County, and for a long time had been outstanding in political affairs of his county and the state. He had served two terms as Trustee of Hamilton County, and in addition was a successful business man, owning substantial interests in several businesses. He had resided in Chattanooga for more than forty years.

The facts constituting the background of the contract and the circumstances surrounding its execution are not in dispute. In the main, they were found by the Chancellor and are as follows:

"While still a very young man Wiley O. Couch located in Chattanooga, Tennessee, where he was employed with the R. Butterton Co. Sometime in 1909 he got acquainted with Anna B. Cawood, a teen-age girl of a respectable family also residing in Chattanooga and with whom he fell in love. When his company moved to Cincinnati

---

1. There was appended to the contract the following certificate:

"Georgia, Fulton County

This is to certify that I, the undersigned, am a Notary Public for the State of Georgia, Fulton County and that I saw the within named parties, Wiley O. Couch and Mrs. W. C. Prendergast, (formerly Anna Beatrice Cawood), sign and affix their names, after reading said instrument.

Given under my hand and seal, this 10th day of July, A. D. 1929.

Jno. Commins

Notary Public,

Fulton Co., Georgia."

Wiley went with it and sent money to Anna to come to Cincinnati to marry him. Without getting married, they took up residence in the Gibson Hotel and lived together as man and wife. After Anna became pregnant they moved to Dr. W. S. Hatfield's residence across the river in Covington, Kentucky, until after the child was born, January 17, 1910.

"Later Wiley Couch returned to Chattanooga and when Anna was able she returned also, bringing with her the young son, Wallace. Wiley, Anna and their son Wallace lived together for some four years, during which time they represented themselves to their relatives and to their friends in Chattanooga and Hamilton and Bradley Counties as man and wife. Part of the time they resided with Miss Cawood's people, her mother and her sister, and part of the time with Mr. Couch's people, the Martins. For all purposes they held themselves out as husband and wife, and father and mother, having a joint bank account and charge accounts in the name of Mr. and Mrs. Wiley O. Couch. During these years Wiley Couch supported Anna Cawood and his son Wallace and provided for them very comfortably.

"About the year 1914 or 1915, the exact time is not shown in the record, Wiley Couch developed tuberculosis and went out West for his health. Before leaving he made arrangements for Anna and his son to reside with Anna's sister, Mrs. Bethea who resided in East Lake, a suburb of Chattanooga.

"In 1915 Wiley Couch married Mabel B. Couch in Hot Springs, Arkansas. They returned to Chattanooga where they resided until his death. Anna B. Cawood married W. C. Prendergast May 8, 1917, and went to live with him in New York, leaving her son Wallace with her sister Mrs. Bethea. Later Mr. Prendergast while return-

ing from Fort Oglethorpe to New York City to join his wife carried with him the young son of his wife, who remained with them until the summer of 1927. During this time Wallace went by the name of Wallace O. Prendergast.

"During the years that Wallace lived in New York he would return to Chattanooga for visits with his mother's people during the summer months. Mr. Couch managed to keep in touch with his son and see him occasionally while the boy was on some of these visits. In 1927 while his son was in Chattanooga Mr. Couch conversed with Mrs. Prendergast by long distance telephone and appealed to her to let him adopt Wallace, who was now seventeen years old, and send him to Baylor School. Finally Mrs. Prendergast agreed for Mr. Couch to place their son in Baylor but she would not agree to the adoption.

"Mr. Couch carried his son out to Baylor and enrolled him by the name of Wallace O. Couch. He instructed the authorities to send him the boy's report cards and he made all of the necessary arrangements for his maintenance and support, the expense of which he bore. From time to time Mr. Couch called at the school to visit with his son and learn of his progress in school. From time to time the boy met his father in town and visited with him. People generally understood that Wallace was Mr. Couch's son and from their observations the relationship of these two was nothing more or less than that of a father and son.

"In the summer of 1929, Wiley Couch obtained the consent of Mrs. Prendergast to adopt their son Wallace. They went to Atlanta, Georgia where Mr. Couch consulted a lawyer, Mr. Cummins, who prepared an instrument entitled a, 'Contract of Adoption', which was ex-

ecuted by the parties. The terms of the contract will be considered hereinafter. Mrs. Prendergast returned to New York and Mr. Couch returned to Chattanooga. Wallace remained in Chattanooga and was entered again at Baylor School.

"For the next few years Mr. Couch undertook to keep Wallace in school and provide for him in every way, as a natural parent would do, except to take him into his home to live with him.

"In 1931 Mr. Prendergast died and in 1932 Mrs. Prendergast returned to Chattanooga, or to a farm located in Bradley County. It appears from the record that Wallace has lived with his mother for the most part after she returned to Tennessee, except for the time he was in the Merchant Marines and also serving with the Armed Forces in World War II. It further appears, however, that Mr. Couch continued to do for his son the things ordinarily expected of a father. In other words, when Wallace came out of Baylor his father obtained employment for him with various concerns in which Mr. Couch was interested. They were often seen together and traveled over the County together in 1942 when Mr. Wiley Couch was campaigning for election to public office. It was after this campaign in which Wiley O. Couch was nominated County Judge in the Democratic Primary that a news item appeared in the local paper announcing Wallace O. Couch's induction into the armed forces. The Times carried Wallace's picture, the heading reciting that he was, 'The son of Wiley O. Couch, Democratic nominee for County Judge of Hamilton County'. The 'dog-tags' which Wallace wore while in the service bear the names of Wallace O. Couch and Wiley O. Couch, showing his father's address as '1268 Duane Road, Chattanooga, Tenn.'

"Once while Wallace was in the service he returned to Cattanooga and was met at the train by Mr. Couch and some of his friends. Mr. Couch evidenced some pride in the fact that his son was in the service of his country, and it was also there that Wallace introduced his father to some of his buddies.

"It must be said, therefore, that the record discloses without any question that Wiley O. Couch looked upon Wallace O. Couch as his son, held him out as his son and treated him as his son for the first four years of the boy's life, and from the time he was seventeen years old until Judge Couch died. This fact is conclusive, notwithstanding the testimony of Mrs. Mabel Couch who testified she knew nothing of the contract of adoption which her husband had executed until shortly before this suit was filed, and nothing concerning the existence of her husband's son except rumors which she heard while he was in Baylor, and which she said she did not believe.

"Let us look now to some of the results of this tragic romance of former years. Presumably to atone in part for the sins of his flesh, Judge Couch sought to give his name to an illegitimate son and give him the right to inherit his father's property, same as a child born in wedlock. To compensate for her part in this illicit love affair, the mother of the child was willing to forego first claim upon his time, his companionship and his devotion. Thus, they made a solemn agreement to effectuate this purpose.

"In the Couch home Wallace was not welcome because of Mrs. Couch's attitude. Thus, he was required to adjust his life to a boarding school, a boarding house, and 'eating out with his father', in lieu of a home and all of its meaning and comforts."

To the foregoing, the following may be added:

It is practically certain that had it not been for the attitude of Mrs. Couch, the complainant would have been taken into the Couch home at the time the attempt was made to adopt him.

Complainant's mother testified that in 1934 she furnished him money with which to attend the Lebanon Law School. Whether he ever did so does not appear; nor does it appear that he entered upon the practice of law; apparently not. The mother also testified that Judge Couch wanted to send the complainant to Princeton University, but so far as appears he did not enter that institution. The only schools which he is shown to have attended are the two preparatory schools in Chattanooga.

After the contract was entered into, Judge Couch procured several jobs for the complainant. He does not seem to have lasted long at any of them. At the time of the trial he was manager of a liquor store in Chattanooga.

There is some evidence that Judge Couch felt that the complainant had not taken full advantage of the many opportunities which had been afforded him, and that he was disappointed in his expectations of the complainant. But there was never any breach in their relations, and until the time of his death Judge Couch continued interested in the complainant's welfare and to regard him as his own son. The complainant testified, and it is not disputed, that his father requested that he accompany him to "Mayo's," apparently referring to the celebrated Mayo's Clinic, in Rochester, Minnesota. Inferentially, it appears that this was in the illness, immediately preceding Mr. Couch's death.

And finally, it should be said that no children were born to Judge and Mrs. Couch.

We have been furnished with exhaustive briefs, particularly on behalf of the complainant, citing many authorities. We are not inappreciative of the efforts of counsel to assist us in this manner; but it would extend the opinion beyond any reasonable length to undertake to discuss the multiplicity of cases dealing with the general subject and involving contracts more or less of the general nature here under consideration. In the view we have of the case, most of them have no application to the determinative questions.

The principal question is, whether the complainant is entitled to the rights conferred by Code Section 8131 on an afterborn child pretermitted in his parent's will. We dispose of this question first.

Code Section 8131 is in the following language:

"A child born after the making of a will, either before or after the death of the testator, inclusive of a mother-testator, not provided for nor disinherited, but only pretermitted, in such will, and not provided for by settlement made by the testator in his lifetime, shall succeed to the same portion of the testator's estate as if he had died intestate."

In Marshall v. Marshall, 25 Tenn. App. 309, 156 S. W. (2d) 449, it was held that a child adopted after the making of a will is within the purview of this section and acquires the same legal status and rights as if born in lawful wedlock to the adoptive parents after the testamentary event. The majority of the courts so hold. Annotation 105 A. L. R. 1176.

It is apparent therefore that upon this phase of the case the inquiry is reduced to the question of whether by virtue of the contract the complainant becomes an adopted child within the meaning of this interpretation of the statute.

476

■ The defendants contend there can be no adoption where the relation of parent and child already exists by nature. For this, several authorities are cited. We think none of them goes so far as the defendants claim. In any event, a sufficient answer is that in this state such an adoption was held valid in the case of Murphy v. Portrum, 95 Tenn. 605, 32 S. W. 633, 30 L. R. A. 263.

■ Defendants also contend that the contract was not supported by any consideration; that the surrender of an illegitimate child by its mother to its father is not sufficient. For this, 1 C. J. 1377 is cited. That text is based on Wallace v. Rappleye, 103 Ill. 229, that being the only authority cited. We have not had access to the report of that case but if it holds what the defendants claim and we have no doubt it does, we do not accept that view.

The contrary was held in Doty v. Doty, 118 Ky. 204, 80 S. W. 803, 2 L. R. A., N. S. 713. Other cases holding that contracts, more or less, of the kind under consideration are supported by a sufficient consideration may be found in the notes appearing in 44 L. R. A., N. S., 756, 764; 27 A. L. R. 1325, 1343 et seq.; 142 A. L. R. 84, 96. See also, Adcock v. Simon, 2 Tenn. App. 617, 623; Chehak v. Battles, 133 Iowa 107, 110 N. W. 330, 8 L. R. A., N. S., 1130; Godine v. Kidd, 64 Hun 585, 19 N. Y. S. 335; 2 C. J. S., Adoption of Children, Sec. 26, p. 394.

■ Nevertheless the purported adoption was not a legal one. The right of adoption was unknown to the common law. It is of statutory origin, and to create the contemplated relation the procedure fixed by the statute must be substantially followed. In re Knott, 138 Tenn. 349, 197 S. W. 1097; Coonradt v. Sailors, 186 Tenn. 294, 209 S. W. (2d) 859, 2 A. L. R. (2d) 880; Rahn v. Hamilton, 144 Ga. 644, 87 S. E. 1061; 2 C. J. S., Adoption of Children, Sec. 1, p. 368; 1 C. J. 1371, 1373. In the present

instance there was no attempt to pursue the remedy provided by the statute of either Georgia or of Tennessee. In fact, no such procedure was contemplated, but just the contrary. The parties resorted to the contract in order to avoid the publicity which would have attended an adoption proceeding in court.

 It will be noted that this is not an executory contract to adopt as is usually the case in litigation of this kind, but an executed contract of purported adoption. The former does not in and of itself make the child the child or heir of the promisor, but in some jurisdictions the latter *by virtue of a statute* constitutes an act of adoption attended by the same consequences as follow from a decree of adoption rendered in judicial proceedings prescribed by statute. 1 Am. Jur. 629, Sec. 15; 633, Sec. 26. But there is no statute in this state and none in Georgia so far as we are advised which authorizes a party or parties to adopt a child by a mere private declaration or contract; and in the absence of such a statute, it cannot be done; because to allow it would be contrary to the public policy of the state as declared by the statutes of descent and distribution, which include the adoption statute, 2 C. J. S., Adoption of Children, Sec. 1, p. 368; Id., Sec. 27, p. 402; 1 C. J. 1371 and 1373; Rahn v. Hamilton, 144 Ga. 644, 87 S. E. 1061; In re Reimer's Estate, 145 Wash. 172, 259 P. 32; Caulfield v. Noonan, 229 Iowa 955, 295 N. W. 466. See Albring v. Ward, 137 Mich. 352, 100 N. W. 609.

In Marshall v. Marshall, supra, the Court was able to reach the conclusion that an adopted child is within the purview of Code Section 8131 only by holding that with the enactment of the Code, the statutory provisions for afterborn pretermitted children and the statutes of descent and distribution, including that providing for

adoption, became related parts of one act to be construed in pari materia and as constituting one system. See also, In re Gossett's Estate, 46 N. M. 344, 129 P. (2d) 56, 142 A. L. R. 1441. Although there are cases apparently holding the contrary, the majority of the Courts entertain this view. Annotation, 105 A. L. R. 1176.

The present case is not within the reasoning of Marshall v. Marshall for here there was no attempt to follow the statutory procedure for adoption and indeed, as said, it was never contemplated that this should be done.

■ Code Section 8131 being a part of the laws of descent and distribution, Marshall v. Marshall, supra, one entitled to the benefit of it takes by inheritance. But the right to inherit cannot be conferred by private contract, notwithstanding that property rights resting upon a legal contract will be recognized and enforced as where one agrees to leave another a share of his estate. Clarkson v. Bliley, 185 Va. 82, 38 S. E. (2d) 22, 171 A. L. R. 1308. Cf. Starnes v. Hatcher, 121 Tenn. 330, 117 S. W. 219.

There is a class of cases involving an attempted though ineffectual adoption wherein it is held that adoptive parents and their privies are estopped to assert the invalidity of the adoption proceedings, or the status of the adopted child, and seemingly as a result the child is held to be entitled to a share in the estate of the quasi adoptive parent dying intestate. Numerous cases to this general effect involving a variety of circumstances are collected in the annotations in 27 A. L. R. 1365, 142 A. L. R. 122, and 171 A. L. R. 1326.

This doctrine presupposes that there was an executory contract to adopt in a manner authorized by a pertinent statute which was not effectually carried out and which if it had been, would have resulted in a legal adoption,

coupled with performance on the part of the child and the party acting in his behalf. Cf. Starnes v. Hatcher, supra.

We have already pointed out that the contract in the present case is not of that kind, but is an executed contract which in and of itself purports to create the artificial relation of parent and child, no further proceedings being intended or contemplated.

But the fact is that where the doctrine of estoppel is applied in this state, relief is granted not upon the theory that the artificial relation of a parent and child contemplated by the adoption statutes arises by estoppel and as a result the child takes by inheritance, but upon the theory that there was an express contract coupled with the executory agreement to adopt or a contract implied from that agreement and the equities of the particular case including performance by the child whereby the promisor became obligated to leave the child all or a share of his property. In such cases the child takes not as an heir under the laws of descent and distribution but as a purchaser by virtue of the contract. Starnes v. Hatcher, supra.

It is true that in Adcock v. Simon, 2 Tenn. App. 617 the Court said that the privies of the adoptive parent in that case were estopped to deny the adoption; but it is nevertheless clear that the true basis of the relief granted was a written contract made by the quasi adoptive parent to give the child a share of his estate upon his death. The child took by contract, not by inheritance as an adopted child. The agreement to adopt and performance by the child and the other party to the contract were pertinent only in their bearing upon the equities of the case, and the fact that the contract to bestow upon the child a share of the estate was in reality made.

■ If the relation of adoptive parent and child cannot be created by a private contract, as we think is certainly true in this jurisdiction, it is equally certain that is cannot arise by estoppel. Cf. Caulfield v. Noonan, 229 Iowa 955, 295 N. W. 466. That doctrine is available to protect a right; never to create one. Henry County v. Standard Oil Co., 167 Tenn. 485, 71 S. W. (2d) 683, 93 A. L. R. 1483; Melton v. Anderson, 32 Tenn. App. 335, 222 S. W. (2d) 666. Succession to intestate property is exclusively a matter for the sovereign political power of the state in which it is situated, and the laws of descent and distribution, of which the adoption statutes are a part, embody a principle of public policy. Clarkson v. Bliley, supra; see, 16 Am. Jur. 777, Sec. 12. To hold that where it has not been otherwise legally created, the artificial relationship of adoptive parent and child can arise by an estoppel would be to provide a method whereby public policy could be defeated by the private act or acts of individuals.

An instructive analogy is to be found in the recent case of Pewitt v. Pewitt, 192 Tenn. 227, 240 S. W. (2d) 521, where it is held that the relation of husband and wife cannot arise by estoppel. In that case, the decision in Hale v. State, 179 Tenn., 201, 164 S. W. (2d) 822, which this Court thought was to the contrary, is explained and the conclusion reached is said to have been rested on another ground.

■ Our conclusion is that only a legally adopted child is entitled to the benefit of Code Section 8131; that a legal adoption can be accomplished only by a proceeding in substantial compliance with the adoption statutes; that therefore the attempted adoption by contract in the present case was ineffectual and hence the complainant is not entitled to the rights of a pretermitted child. This

view is in accord with the well-considered opinion of Chancellor Woodlee.

By the second clause of the contract it was intended to confer upon the complainant the same right of inheritance that a natural legitimate child has under the laws of descent and distribution, but it remains to be determined whether by reason of this provision the deceased was precluded from disposing of his entire estate by will, to the exclusion of the complainant.

 There is little if any dissent from the view that in a proper case a court will decree specific performance of a contract to leave at death a share of property to another without regard to whether the latter is to be or was legally adopted. The cases to this effect are too numerous to mention. Many of them are collected in the annotations appearing in 44 L. R. A., N. S., 756; 27 A. L. R. 1326 and 1365; 142 A. L. R. 84; and 171 A. L. R. 1316.

Complainant's chief reliance is the principle adopted in the case of Starnes v. Hatcher, supra, and the array of cases of which it is typical. In the Starnes case, notwithstanding that there was no effectual adoption of the children involved, the Court granted specific performance of a contract made by the intestate to leave said children his property at his death. The intestate's promise was an unqualified one. The relief granted did not to any extent depend upon the unfulfilled promise to adopt the children. That promise coupled with performance on the part of the children, was pertinent only as establishing the equities of the case and throwing light on the intention of the parties in making the contract.

To show that that case is not in point, it would perhaps be sufficient to point out that there the promisor died intestate. But there is another point of distinction

which is equally vital. This is that the contract in the Starnes case conferred upon the promisees a greater and more far-reaching right than they would have had as the result of a legal adoption in that there was an unqualified promise by the deceased to leave the children in question his property at his death, whereas the promise before us was not to leave the complainant all or any part of the deceased's estate, but only to confer upon him the right of inheritance which a legitimate natural child has under the statutes of descent and distribution, and hence the same right he would have had if he had been adopted in a statutory proceeding and the effect of the adoption not limited by the decree. Code Section 9570.

The fact that Judge Couch died testate rather than intestate serves also to distinguish the present case from Adcock v. Simon, supra, which the complainant cites with confidence.

These distinctions, one or both of them, exist in most if not all of the many cases from other jurisdictions which are cited in the complainant's brief.

Standing alone, and strictly construed, the agreement in the second paragraph of the contract is a contract of inheritance and, as already said, is not valid, technically speaking, Clarkson v. Bliley, supra; Anderson v. Anderson, 75 Kan. 117, 88 P. 743, 9 L. R. A., N. S., 229; Albring v. Ward, 137 Mich. 352, 100 N. W. 609.

It is true however that most if not all courts taking the broad view in interpreting such contracts hold that an agreement "to make an heir" of a child or "to adopt and leave property", are not really contracts of inheritance but are in substance contracts of purchase, which can be specifically enforced according to the intention of the parties. See Adcock v. Simon, 2 Tenn. App. 617; Chehak v. Battles, 133 Iowa 107, 110 N. W. 330, 8 L. R. A.,

N. S., 1130, and note. Other cases may be found in the annotations hereinabove cited.

So if Judge Couch had died intestate with respect to all or any part of his estate, we think that under the liberal construction adopted in the cases above cited, the complainant would have been entitled to specific performance of the promise that he should inherit as a legitimate natural child and would accordingly be let into the estate; and this, regardless of whether there was a legal adoption. Adcock v. Simon, supra, Cf. Starnes v. Hatcher, supra. But in that event he would not take by inheritance but under the contract.

 But Judge Couch did not die intestate. Upon the contrary, as said, by his will he bestowed all of his property upon others, making no mention of the complainant. We cannot agree that the contract prevented the deceased from doing this. We do not have here an effort to reform a contract but the assertion of rights alleged to have accrued under a written one as it stands and the rules relative to the interpretation of contracts generally are applicable.

The cardinal canon is to discover and give effect to the intention of the parties as expressed by the language used or necessarily implied from that language, illuminated by the circumstances. An intention not so expressed cannot be given effect, however certainly entertained by either one or both of the parties.

It is to be remembered that this contract was drawn by a lawyer. If the intention had been to make a contract giving the complainant a vested interest in the estate of the adoptive father which the latter could not defeat by will, it is inconceivable that a lawyer would have used the language he did when it would have been a very simple matter to have given expression to that intention

so as to leave it in no doubt. And this is especially true when it appears that the lawyer investigated the authorities dealing with contracts of adoption and their effect before he prepared the instrument.

We think the intention was to accomplish by contract what would have been accomplished by a statutory proceeding for adoption. This finds support in the certainty that the parties would have pursued that remedy except for a desire to avoid the publicity attendant upon it. For this reason they went to another state and consulted a lawyer to determine whether the same end could be validly accomplished by a private contract. This is fairly to be inferred from the circumstances. That they received erroneous advice is beside the point upon the inquiry as to what was the intention of the parties.

The transaction was primarily an adoption contract. Adoption and its effect were the dominating thought. The agreement as to how the complainant should inherit was a mere description of what the effect of the adoption should be—that is, the rights of inheritance which it was intended should result to the complainant. The reason for this provision becomes apparent when it is considered that in this jurisdiction the right of inheritance does not necessarily and inevitably result from the mere fact of adoption alone. The effect may be limited in the decree. Code Sec. 9570. Hence it is customary to provide in the decree not only the fact of the adoption but the extent of the right of inheritance where it is desired to confer that right on the child.

That, we think, accounts for the second paragraph in the contract.

If that identical provision had appeared in a decree rendered in a statutory adoption proceeding, it is certain that the effect would not have been to deprive the

deceased of the right to dispose of all of his property by will, making no provision for the complainant. Rogers v. Baldridge, 18 Tenn. App. 300, 76 S. W. (2d) 655; McLean v. McAllum, 131 Miss. 234, 95 So. 309.

The fact that the provision is found in a private contract rather than in a decree rendered in an adoption proceeding, does not operate to make it reach any further.

We have not been concerned with Judge Couch's motives in limiting the rights conferred upon complainant to those of a legitimate natural child, knowing at the time that he then had a will bestowing all of his property on others and in not thereafter making any change in his testamentary dispositions. Any conclusion in that regard would be pure speculation, a luxury in which the Court has no right to indulge.

But we may say that when the whole matter is objectively considered, it does not appear to be unnatural that deceased should have desired to retain the same right to disinherit complainant that he would have had to leave out of his estate a legitimate natural son. There appears no reason why complainant should have been preferred in that respect.

By what has been said, the entire controversy has been disposed of and it is therefore unnecessary to pass on other questions raised by the parties. The result is that the action of the Chancellor dismissing the bill was correct.

McAmis and Swepston, JJ., concur.