**Marilyn Heitman CARTER, as next friend of Joseph Stanley Carter, Plaintiff/Appellant,**

**v.**

**Shirley HUTCHISON and William A. Smith, Jr., Defendants/Appellees.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

Dec. 18, 1985.

Application for Permission to Appeal Certiorari Denied by Supreme Court, April 8, 1986.

---

**534**

William D. Mitchell, Sparta, Michael D. Galligan, McMinnville, for plaintiff/appellant.

Jim H. Camp, Sparta, for defendants/appellees.

## OPINION

KOCH, Judge.

This appeal involves a dispute concerning the intestate distribution of the estate of an elderly couple who were murdered by one of their two grandsons. The mother of the innocent grandson filed this action in the Chancery Court for White County seeking a determination of the parties' interests after the child of the guilty grandson claimed that he was entitled to a portion of his great-grandparents' estate. The trial court heard the case on the pleadings and on November 28, 1984, entered an order granting the guilty grandson's child a twenty-five percent interest in his great-grandparents' estate. His uncle, the innocent grandchild, has perfected this appeal. We affirm the decision of the trial court even though we disagree with its reasoning.[1]

### I.

### The Facts

John Henry Carter and his wife, Laura Francis Flatt Carter, lived in Sparta on a one hundred and twenty acre farm. They had two children, Shirley Hutchison and William Lloyd Carter. William Lloyd Carter died on November 29, 1972, leaving a wife and two sons, John Edward Carter and Joseph Stanley Carter.

John Edward Carter murdered his grandparents on June 27, 1981. Shirley Hutchison was named administrator of her parents' estate on July 6, 1981. Neither John Henry Carter nor Laura Francis Flatt Carter had prepared a will, thus, their estate which included their home, farm property, and approximately sixty thousand dollars in personal property will be distributed in accordance with the laws of intestate succession (Tenn.Code Ann. § 31–2–101 *et seq.*).

On January 9, 1982, Deborah L. Smith gave birth to John Edward Carter's son and named him William A. Smith, Jr.[2] John Edward Carter was convicted of two counts of first degree murder on December 9, 1982. He is presently incarcerated in the state penal system.

Prior to the distribution of John Henry Carter's and Laura Frances Flatt Carter's estate, Shirley Hutchison was informed that William A. Smith, Jr. intended to assert a claim for a distributive share of his great-grandparents' estate based upon Tenn.Code Ann. § 31–2–104(b)(1).[3] Joseph

---

1. It has long been recognized that appellate courts may affirm a decree of the trial court that is correct in result even though it is rendered upon "different, incomplete or erroneous grounds." *Hopkins v. Hopkins,* 572 S.W.2d 639, 641 (Tenn.1978). See also *Bohlinger v. American Credit Co.,* 594 S.W.2d 710, 713 (Tenn.App. 1979) and *Handley v. May,* 588 S.W.2d 772, 777 (Tenn.App.1979).

2. Mrs. Smith was married to William A. Smith throughout her entire liaison with John Edward Carter. Upon the birth of the boy, Mr. Smith permitted him to bear his name. The boy's paternity is not an issue on this appeal. On November 28, 1984, the trial court granted a

Tenn.R.Civ.P. 12.03 judgment on the pleadings on this issue. Neither party has challenged this decision.

3. Tenn.Code Ann. § 31–2–104(b)(1) provides:
   The part of the intestate estate not passing to the surviving spouse under subsection (a) or the entire intestate estate if there is no surviving spouse, passes as follows:
   (1) To the issue of the decedent; if they are all of the same degree of kinship to the decedent they take equally, but if of unequal degree, then those of more remote degree take by representation.

Stanley Carter's mother objected and took the position that her son was entitled to the entire one half interest in the estate descending through William Lloyd Carter. She based this assertion upon Tenn.Code Ann. § 31–1–106 which she interpreted as applying to persons claiming an inheritance through a slayer in the same way it applies to the slayer himself.

The trial court awarded William A. Smith, Jr. one quarter of his great-grandparents' estate.[4] Thus, the stage has been set for this Court's consideration of a question of first impression in this State. This issue is whether the General Assembly, by enacting Tenn.Code Ann. § 31–1–106, intended to prevent certain of the victim's descendants from receiving a portion of his estate when these descendants are also the children of the person who killed the deceased. Based upon Tennessee's statute and the earlier cases construing it, we agree with the trial court that the General Assembly did not intend to visit the sins of a parent upon his children.

## II.

### The Development of Tenn.Code Ann. § 31–1–106

Whether the law should permit a killer to acquire an interest in his victim's property has been debated by legal authorities and scholars for years. Not much longer than one hundred years ago, the courts in this State apparently permitted a killer to inherit his victim's property. This was recognized implicitly in a case where a man had killed his wife because she had filed for a divorce. While the husband was disqualified from inheriting on other grounds, the

court recognized that the killing alone was not sufficient to prevent him from inheriting his wife's property. *Carter v. Montgomery*, 2 Tenn.Ch.Rep. (Cooper) 216, 220 (1875). This decision was in accord with the majority rule for cases involving intestate succession.[5]

However, permitting the slayer to benefit from his crime did not rest easily with the courts. See *Mutual Life Ins. Co. v. Armstrong*, 117 U.S. 591, 600, 6 S.Ct. 877, 881, 29 L.Ed. 997 (1886) and B. Cardozo, *The Nature of the Judicial Process* 43 (1921). Thus, various courts, in the absence of legislative action, began to engraft exceptions to the laws of descent and distribution to prevent a slayer from inheriting from his victim when they could not identify some other legal means to do so. Two of these exceptions are illustrated by the cases holding that no title passed to the slayer or that legal title passed to the slayer but that equity held him as the constructive trustee for the heirs of the decedent.[6]

Tennessee is one of those states that followed the authorities holding that the slayer never inherits an interest in his victim's property. A divided Tennessee Supreme Court adopted this rule in a case characterized by the dissenting judge as a hard case making bad law. This case, like *Carter v. Montgomery*, 2 Tenn.Ch.Rep. (Cooper) 216 (1875), involved a domestic dispute in which a husband killed his wife after she refused to reconcile with him and then committed suicide. Disputes arose concerning the disposition of certain real property the couple had owned as tenants by the entirety and the proceeds of an insurance policy on the husband's life that had been assigned to and maintained by the wife out of her

---

**4.** This is the same portion of the estate that he would have received pursuant to the law governing intestate succession had his father predeceased his victims. It is more than mere coincidence that the trial court's November 28, 1984 order is based upon its conclusion that the effect of Tenn.Code Ann. § 31–1–106 is to create a presumption that John Edward Carter predeceased his victims.

**5.** See L. Maki & A. Kaplan, *Elmer's Case Revisited: The Problem of the Murdering Heir*, 41 Ohio St.L.J. 905, 906–908 (1980) [hereinafter cited as

"Maki & Kaplan"]; W. McGovern, *Homicide and Succession to Property*, 68 Mich.L.Rev. 65, 66–67 (1969); and J. Wade, *Acquisition of Property by Willfully Killing Another—A Statutory Solution*, 49 Harv.L.Rev. 715, 717 (1936) [hereinafter cited as "J. Wade"].

**6.** See Maki & Kaplan, *supra* n. 5 at 923–30; 5 A. Scott, *The Law of Trusts* § 492 (3d ed.1967) [hereinafter cited as "Scott on Trusts"]; and J. Wade, *supra* n. 5 at 717–19.

separate funds. These disputes resulted in two different legal actions which were reviewed separately by the Tennessee Supreme Court at the same term.

The Tennessee Supreme Court issued separate opinions in each of these cases. Both opinions were prepared by Chief Justice Beard. The case involving the disposition of the couple's jointly held real property was decided first in an unreported opinion.[7] The second case involving the couple's personal property was decided approximately four months later. In this case, the administrator of the husband's estate claimed the proceeds of an insurance policy on the husband's life based upon the common law right of a surviving husband to take title to a deceased wife's choses in action. Relying upon what they termed a "fundamental maxim" that "[n]o one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime," the majority held

> We think, if it is a sound holding that one named as a payee of a policy by the felonious homicide of the assured is, with his assignee, cut off from receiving the benefit of that policy notwithstanding its expressed terms, that with much more force it can be insisted that one who claims under the common law rule invoked in this case must be disappointed of recovery. *Box v. Lanier*, 112 Tenn. 393, 413, 79 S.W. 1042, 1046 (1904).

In order to avoid a conflict with the prohibition against forfeiture of estates in Article I, Section 12 of the Tennessee Constitution, the Court also emphasized:

> The application of the principle, which we hold to be fundamental and controlling in this case, intervenes between him and the property, so that he never acquired an estate and therefore forfeited nothing

in it. *Box v. Lanier*, 112 Tenn. 393, 413, 79 S.W. 1042, 1046 (1904).

Even though the defendant in *Box v. Lanier* was the administrator of the husband's estate, the majority chose to frame its opinion as if the husband were alive. Thus, the majority never directly considered the effect its decision would have on others who might participate in the estate through the laws of descent and distribution. The effect of the majority's opinion upon innocent third parties was not, however, lost upon Justice Wilkes who, in a strongly worded dissent, pointed out that

> It is not the case of a murderer taking the fruits of his own crime. The administrator does not hold under the murderer, nor for his benefit. He holds under the terms of the policy, and for the benefit of the next of kin or creditors of the assured, who are not, or should not be, in any way affected by the crime of the assured. The right to the proceeds does not come to the administrators or next of kin of creditors through any assignment of the murderer, or any descent from him, but solely under the terms of the policy, and the statute applicable thereto. They do not take and do not hold under the murderer, but under the policy, and are innocent of all crime and all bad faith.
>
> To hold with the majority is, in truth, to visit upon the children the iniquities of the father, which human law does not do, whatever may be the rule of the divine law. *Box v. Lanier*, 112 Tenn. 393, 424–25, 79 S.W. 1042, 1049 (1904) (Wilkes, J. dissenting).

Responding to the Tennessee Supreme Court's call for the arousal of the "legislative conscience to speedy corrective legislation,"[8] the General Assembly enacted Chapter 11, Public Acts of 1905.[9] This

---

7. *Lucas v. Harris*, Humphreys Equity (Tenn. Dec. 9, 1903). The Tennessee Supreme Court later discussed and relied upon the holding of this case in *Beddingfield v. Estill & Newman*, 118 Tenn. 39, 49–50, 100 S.W. 108, 111 (1907). At the Tennessee Supreme Court's request, the

discussion of the *Lucas v. Harris* decision originally included in this section has been deleted.

8. See *Box v. Lanier*, 112 Tenn. 393, 410, 79 S.W. 1042, 1045 (1904).

9. This bill provided:

statute provided that the slayer would forfeit all right, interest and estate in his victim's property and that the deceased's property would be distributed among his remaining descendants.

Within a year after the enactment of Chapter 11, Public Acts of 1905, the Tennessee Supreme Court was again presented with a case involving the ownership of real property that had been owned by a husband and wife as tenants by the entirety. The husband murdered his wife, and then executed a deed of trust on the property to his lawyers to secure the payment of their legal fees. In a dispute between the children and heirs of the murdered wife and the husband's lawyers, the Tennessee Supreme Court, found in favor of the husband's lawyers. In response to the children's claims that Chapter 11, Public Acts of 1905 prevented their father from obtaining any interest in this property, the Court stated:

> It was not the intention of the general assembly that vested rights of this character should be forfeited by the murderous act of the owner therein stated. It was only intended that he should not in any way acquire any new rights or property interest from others as the result of his crime. Any other construction of the statute would render it void. *Bedding-*

*field v. Estill & Newman,* 118 Tenn. 39, 50, 100 S.W. 108, 111 (1907).

The General Assembly undertook a comprehensive revision of Tennessee's laws of descent and distribution when it enacted Chapter 538, Public Acts of 1976. In Section 8 of this Act, the General Assembly revised Chapter 11, Public Acts of 1905 by substituting its original language for that appearing now in Tenn.Code Ann. § 31–1–106. Thus, Tennessee is among the forty states and the District of Columbia that have enacted forfeiture statutes.[10]

This summary highlights four important aspects of the development of Tennessee's law. First, the Tennessee Supreme Court has held repeatedly that a slayer himself should never obtain any interest, legal or equitable, in the property of his victim. See *Box v. Lanier,* 112 Tenn. 393, 413, 79 S.W. 1042, 1046 (1904). This Court has consistently followed this rule. *Houser v. Haven,* 32 Tenn.App. 670, 673, 225 S.W.2d 559, 560 (1949) and *Metropolitan Life Insurance Co. v. May,* 10 Tenn.App. 221, 224 (1929). Second, although having the opportunity to do so, the Tennessee Supreme Court has declined to adopt the "constructive trust" theory that has been followed in many other states.[11] Third, the General Assembly has not enacted a statutory presumption that the slayer predeceased his victim but rather has been content to leave

That any person who shall hereafter kill, or conspire with another to kill, or procure to be killed, any other person from whom such person so killing or conspiring to kill, or procuring said killing, would inherit the property, real, personal, or mixed, or any part thereof, belonging to such deceased person at the time of death, or who would take said property by deed, will, or otherwise, at the death of the deceased, shall forfeit all right, interest and estate in, and to said property, and the same shall go to such other persons as may be entitled thereto by the laws of descent and distribution, or by will, deed, or other conveyance duly executed by the deceased in his or her lifetime, provided that this Act shall not apply to any such killing as may be done by accident, or in self-defense.

10. A vast majority of states enacting forfeiture statutes have patterned them after the model statute proposed by Dean Wade in 1936, see J. Wade, *supra* n. 5 at 753–55, or the Uniform Probate Code. Thus, in twenty-nine states there

is a statutory presumption that the victim's property passes to his estate as if the slayer had predeceased the decedent. See Uniform Probate Code § 2–803 (1983) and J. Wade, *supra* n. 5 at 753 Section 4. Four states provide for forfeiture but are silent as to distribution. Tennessee is among ten states that provide for forfeiture and for distribution to the decedent's heirs through the laws of intestate succession. The eight remaining states without statutes have forfeiture provisions by court decision. See generally Maki & Kaplan, *supra* n. 5 at 957.

11. The reason for this may be that it would require the Court to depart from *Box v. Lanier.* Were it not for the Tennessee Supreme Court's precedents, we would have no hesitation in adopting the constructive trust theory in this case. It is the better reasoned authority. Scott on Trusts, *supra* n. 6 at 3492–3497. See also Restatement of Restitution § 187(2) (1937).

substantially unchanged a statute it enacted eighty years ago. Finally, the General Assembly has, likewise, made no explicit provision for the distribution of an estate to heirs of the deceased who are also the children of the slayer. It is against this backdrop that we consider the issue presented in this case.

## III.

*The Effect of Tenn.Code Ann. § 31–1–106 Upon William A. Smith, Jr.'s Right to Share in His Great-grandfather's Estate*

Our determination of William A. Smith, Jr.'s rights in this case must be governed by Tenn.Code Ann. § 31–1–106 because it is the exclusive prerogative of the General Assembly to prescribe by statute the manner in which intestate estates within its boundaries will be distributed. *Housley v. Laster*, 176 Tenn. 174, 177, 140 S.W.2d 146, 147 (1940); *Cole v. Taylor*, 132 Tenn. 92, 102–03, 177 S.W. 61, 64 (1915); *Napier v. Church*, 132 Tenn. 111, 119, 177 S.W. 56, 58 (1915); and *Couch v. Couch*, 35 Tenn. App. 464, 480, 248 S.W.2d 327, 334 (1951). It is our responsibility to apply the statute in a way that fulfills the Legislature's intent. *Westinghouse Electric Corp. v. King*, 678 S.W.2d 19, 23 (Tenn.1984) and *Plough, Inc. v. Premier Pneumatics, Inc.*, 660 S.W.2d 495, 498 (Tenn.App.1983). We should avoid frustrating the statute's objective. *State ex rel. Lockert v. Knott*, 631 S.W.2d 124, 127 (Tenn.1982).

Tenn.Code Ann. § 31–1–106 accomplishes two things. First, it provides that a person who kills another will forfeit all rights in the victim's property.[12] Second, it provides that the victim's property should be distributed in accordance with Tenn.Code Ann. § 31–2–104, Tennessee's statute involving intestate successors. This statute, in turn, provides that the estate of a decedent leaving no surviving spouse should pass to the "issue of the decedent." Thus, when read together, these statutes provide that the issue of a murdered decedent may share in the estate unless they are otherwise barred.

Tennessee's use of the term "issue of the decedent" in its intestate succession statute differs from the more common reference to "heirs at law," "heirs," or "heirs of the body". It is this difference upon which our decision is based.

■ The "issue of the decedent" are, unless otherwise limited, all the direct, lineal descendants of the deceased. *Burdick v. Gilpin*, 205 Tenn. 94, 109, 325 S.W.2d 547, 554 (1959); *Third National Bank in Nashville v. Noel*, 183 Tenn. 349, 358, 192 S.W.2d 825, 828 (1946); and *White v. Kane*, 178 Tenn. 469, 475, 159 S.W.2d 92, 94–95 (1942) (construction of the antilapse statute). The Tennessee Supreme Court has also noted that the term can be broad enough to cover descendants of every degree. *Lea v. Lea*, 145 Tenn. 693, 697, 237 S.W. 59, 60 (1922).

William A. Smith, Jr. is the great-grandson of John Henry Carter and Laura Francis Flatt Carter. He is, therefore, among the class of persons who are issue of the decedents. His status as a member of the class is not affected by the circumstances of his birth or the fact that he was unborn at the time his great-grandfather was killed.[13]

As one of the issue of his great-grandfather, William A. Smith, Jr. has a claim against his great-grandfather's estate independent of his father. Since Tenn.Code Ann. § 31–2–104(b)(1) is couched in terms of "issue of the decedent," it is William A. Smith, Jr.'s relationship to his great-grandfather that controls, not his relationship to his father. While he would be required to

---

**12.** This is, without question, the prevailing American rule today. See Annot., 25 A.L.R. 4th 787 (1983).

**13.** He was *en ventre sa mere*, and thus the Tennessee Supreme Court has held that he was entitled to inherit. *Hogan v. McDaniel*, 204 Tenn. 235, 244, 319 S.W.2d 221, 223 (1958). See also *Estate of Wolyniec v. Moe*, 94 N.J.Super. 43, 46, 226 A.2d 743, 744 (1967) (grandchild born after its mother killed its grandfather was permitted to inherit from its grandfather.)

claim through his father to be an heir of his great-grandfather, he is not required to do so to establish his status as one of the issue of the descendants. This is in accord with those authorities in cases of this nature that draw a distinction between persons whose only claim is through the slayer and those who have their own, independent claim against the deceased's estate. See 23 Am.Jur.2d *Descent and Distribution* § 109 (1983).

Thus, in accordance with our construction of Tenn.Code Ann. § 31–1–106, we need not, by judicial fiat, engraft a presumption that a slayer predeceases his victim onto our descent and distribution statutes. While our decision may have the same effect,[14] it is not for the Courts but the Legislature to articulate the State's policy with regard to the distribution of descendants' estates. It is also unnecessary for us to rely upon the "constructive trust" theory relied upon by the trial court. Indeed, until the Tennessee Supreme Court sees fit to modify *Box v. Lanier*, 112 Tenn. 393, 79 S.W. 1042 (1904), it would be improper to employ this theory in cases such as this one because of the holding that the slayer receives no interest in the deceased's property. Thus, there is nothing in the hands of the slayer upon which a constructive trust can be imposed.

We, therefore, find that William A. Smith, Jr., as one of the issue of John Henry and Laura Frances Flatt Carter, is entitled to a share of his great-grandparents' estate pursuant to Tenn.Code Ann. § 36–2–104(b)(1). Since his father's share, by statute, has been forfeited, William S. Smith, Jr. takes a twenty-five percent interest in the estate by representation. While we do not adopt the trial court's rationale, the judgment of the trial court is affirmed, and the case is remanded.

The costs of this appeal are taxed against the appellant and her surety for which execution, if necessary, may issue.

TODD, P.J., and CANTRELL, J., concur.

---

**14.** While employing a different rationale, the Tennessee Supreme Court produced the same effect in *Brooks v. Thompson,* 521 S.W.2d 563,

567 (Tenn.1975). While the Court recognized the existence of the "constructive trust" theory, it stopped short of adopting it in that case.